## VIOLA B. HOFF *v.* THE STATE OF DELAWARE.

(*January* 31, 1938.)

LAYTON, C. J., RODNEY and SPEAKMAN, J. J., sitting.

*P. Warren Green,* Attorney-General, and *C. Edward Duffy,* Deputy Attorney-General, for the State (J. Donald Craven of Counsel).

*H. Albert Young* for defendant.

Superior Court for New Castle County, September Term, 1937.

LAYTON, C. J., delivering the opinion of the court:

▉ The title of the act reasonably discloses its nature and purpose. Fairly considered, it includes but one subject. See *State v. Grier, 4 Boyce* 322, 88 *A.* 579, and *In re Cypress Farms Ditch, 7 W. W. Harr.* (37 *Del.*) 71, 180 *A.* 536,

where some of the decisions in this State on the question are collected.

The substantial questions to be determined are whether the act delegates legislative power to the Board of Examiners; and whether the act is a reasonable exercise of the police power of the State as applied to the particular trade or occupation.

The subject-matter of the act is concerned with female beauty or loveliness. Beauty culture, speaking generally, is the means employed to improve personal appearance. It embraces the care of the skin, the hair, the hands and nails, the teeth and body, to make them conform to the artificial standard currently regarded as beautiful. The means employed to accomplish the desired end may include diet, exercise, hygiene, electricity, X-ray, radium, gland stimulation and gland extracts, water cures, sun-treatments, plastic surgery and even mental science. More generally, use is made of lotions, creams, salves, ointments, rouge, mascara, mud or clay applications on the face and body, either singly or in combination with massage, stroking or stimulation either by hand or mechanical appliances, the removal of superfluous hair, plucking of eyebrows, tinting of finger nails and even toe nails, and artificial sunburn; and the cleansing, arranging, dressing, curling, waving, singeing, bleaching and dyeing the hair. The field is wide, the methods and means multifarious.

Cosmetics, rouges, and hair dressing, and other artificial means supposed to improve the personal appearance of women, from earliest times have played a part in civilized and uncivilized society. The savage idea of beauty is expressed in one way, the civilized conception in another. In some respects they are not far apart. From time immemorial persons have been engaged in the art or science of what is now called beauty culture, and until recently the

trade or occupation has been regarded as one enjoyable as of common right; like barbering, a closely allied occupation, it is increasingly being subjected to regulation as an occupation affected with a public interest.

The defendant contends that the act delegates legislative power to the Board of Examiners.

It is well settled that a Legislature, in enacting a law, complete in itself, for the regulation of particular matters, may expressly authorize an administrative body, within definite limits, to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose. The power of delegation is based upon the necessity occasioned by the growing demands made upon legislative bodies by the ever increasing complexity of human affairs. It is conceded that it is difficult to mark the line which separates the legislative power to make laws from administrative authority to make regulations; and in the classic language of Judge Ranney, in *Cincinnati, W. & Z. Ry. Co. v. Clinton County Com'rs,* 1 *Ohio St.* 77, 88, the true distinction is between the delegation of power to make the law, which necessarily involes a discretion as to what it shall be, and conferring authority and discretion as to its execution, to be exercised in pursuance of the law.

The Legislature must declare the policy of the law, and must establish some principle or rule of action which is to control in given cases. In other words the Legislature must provide an adequate yardstick for the guidance of the administrative body empowered to execute the law; for, to uphold a delegation of power there must be discovered in the terms of the Act a standard reasonably clear whereby discretion must be governed. In the striking phrase of Justice Cardozo, in *Panama Refining Co. v. Ryan,* 293 *U. S.* 388, 440, 55 *S. Ct.* 241, 256, 79 *L. Ed.* 446, the discretion must be "canalized within banks that keep it from overflow-

*ing.*" See *State v. Retowski,* 6 *W. W. Harr.* (36 *Del.*) 330, 175 *A.* 325; *Blackstone's Appeal,* 8 *W. W. Harr.* (38 *Del.*) 230, 190 *A.* 597.

The declared policy of the law is to restrict the practicing and teaching of beauty culture to those who possess knowledge and proficiency. Apart from the exemptive provisions of *Sections* 6 and 8, there are two ways by which one may qualify for permission to take an examination for an operator's certificate; one by showing registration as a student and training in a "duly registered beauty school"; the other, by showing registration and service as an apprentice for at least two years.

The act nowhere defines the term, "beauty school." It makes no mention of the subjects and matters as to which knowledge and proficiency are required; and it is silent as to system, course, scope or length of instruction and training in such school. Graduation is not required, nor even a minimum length of attendance demanded. The law contents itself with the vague and indefinite phrase, "and has had training in a beauty school duly registered by the Board."

It must be supposed, therefore, that a "duly registered beauty school" is one that the Board of Examiners see fit to register, regardless of system or course of instruction.

In the act are such terms and phrases as, "education," "preliminary education," and "studies necessary to become an operator." Whether "education" and "preliminary education" are meant to refer to education in general or education in the occupation, is left in doubt; but it will be assumed that they refer to the latter, as, undoubtedly, does the phrase "studies necessary to become an operator." However used, the act neither defines nor explains them, nor does it enumerate the studies.

The result is that the act fails to furnish a standerd by which the discretion of the Board must be governed, either by definition or explanation of terms, or by an enumeration of subjects and matters as to which knowledge and proficiency is deemed indispensible.

It is answered that the definition of beauty culture supplies the standard; that it is not to be supposed that the Board will act unreasonably; and that, if it does, the act affords a corrective by providing the right of appeal to the courts. The constiutionality of the grant of power must, of course, be determined by the language of the grant, and not by the manner in which the power may be exercised. But, the particular vice of the argument is that the definition of the term, beauty culture, is no definition at all. The derivation of the word, "define," suggests its meaning, which is, to "limit." To define, is to express with precision the essential constituents of a term, whereby to furnish an adequate explanation of its significance. When examined, the statutory definition amounts to this: Beauty culture is all work generally and usually performed for pay in hairdressing and beauty shops by beauticians for the beautification of women. It is an attempt to define a term by making use of the term itself. The result is a circular progression with no advancement in clearness and certainty of idea. It is clear enough even to the male, considering the scope of beauty culture and the means and methods employed, that work generally and usually done in one shop may differ largely from that done in another, in extent, method, means and technique. The character of the work will depend upon the location of the shop and the demands of its patrons. The city shop, for example, with an exacting clientele, may differ essentially as to means and methods from a village shop having a less fastidious patronage, and yet both shops may be conducted with due regard to the public health and safety. An operator fully competent to

do the work "generally and usually" done in the village, may be unable to meet the requirements of a city shop. And, further to show the utter inadequacy of the definition as a rule of action, the act provides that an examination for a teacher's or manager's certificate shall differ from that for an operator's certificate, in that it "shall be of a more exacting nature and require higher standards of knowledge of the practice and theories of beauty culture." This is obscurity piled on vagueness.

The definition of beauty culture, if it can be called a definition, points out no fixed path in which the Board must tread. It furnishes no intelligible standard for their guidance in the determination of fitness, and it gives no information to those desiring to engage in the occupation, or to the public whose protection the act ostensibly seeks, as to the requirements of knowledge and proficiency demanded.

The rules with respect to the registration of beauty schools, and to the nature and scope of examinations held to determine fitness to engage in an occupation heretofore regarded as one enjoyable as of common right, are those which the Board may choose to make with no limitation on its power and authority, and with no standard or guide except that which is conveyed by the lax phrase "generally and usually performed." To use again the phrase of Justice Cardozo, in the cited case, the discretion conferred on the Board is unconfined and vagrant. It amounts to a roving commission.

Clearly, the authority delegated is not mere authority to make rules within a fixed circumference. Essentially the Board of Examiners is empowered to make the law by which opportunity and fitness to engage in the occupation is to be governed, and from time to time, to amend, alter, change or modify the law.

We do not say that the Legislature, in the regulation of occupations, must, in every case, provide a standard of qualifications either by definition, or by enumeration of subjects as to which knowledge and proficiency is deemed necessary. In many of the occupations, trades and professions, perhaps in most of them, the nature of the particular work or service is a matter of such common knowledge as to make it unnecessary to do more than to authorize the administrative agency to determine, by an appropriate test or examination, the fitness of one desiring to engage therein. But the occupation, known as beauty culture, embraces such different and unrelated work, and has such breadth, diversity and complexity of scope, that it is not commonly known with any exactness what is meant when the term, beauty culture, is used. In such case, a regard for constitutional principles demands that the Legislature declare, with reasonable precision, what is intended to be within the field of regulation, and the standard by which fitness is to be measured. *State v. Briggs,* 45 *Or.* 366, 77 *P.* 750, 78 *P.* 361, 2 *Ann. Cas.* 424, and *Clark v. State,* 169 *Miss.* 369, 152 *So.* 820, strongly relied upon by the State, do not appear to be to the contrary. In the first case, while the statute is not quoted, it is said that it defines what shall constitute the occupation of a barber. In the second case, the statute seems to define barbering with reasonable precision.

It is next to be determined whether the act is a reasonable exercise of the police power of the State as applied to the particular occupation.

Before entering upon a consideration of the extent of the police power of the State under the *Fourteenth Amendment* to the *Federal Constitution* and the analogous provision of the *Seventh Section* of the *Bill of Rights* of the *Constitution of Delaware,* it is advisable to refer to another

provision of the latter *Constitution,* which was not presented at all in the oral argument nor considered in the briefs.

*Article* 12 of the *Constitution* provides as follows:

"The General Assembly shall provide for the establishment and maintenance of a State Board of Health, which shall have supervision of all matters relating to public health, with such powers and duties as may be prescribed by law; and also for the establishment and maintenance of such local boards of health as may be necessary, to be under the supervision of the State Board, to such extent and with such powers as may be prescribed by law."

This provision of the organic law was, of course, intended to have meaning. and effect. To what extent the act under consideration may be in conflict with it, we express no opinion; but we do suggest the doubt whether under the broad language of the article, some of the provisions of the act could be upheld.

Property, in a broad sense, is defined as any valuable right or interest considered primarily a source or element of wealth. The right of a citizen to earn his living in any legitimate field of industry, submitting himself to all lawful regulations, is one of his most valuable rights, and one which the Legislature may not unreasonably interfere with or abridge. The *Slaughter House Cases,* 16 *Wall.* 36, 21 *L. Ed.* 394; *Yee Gee v. City, etc., of San Francisco, (D. C.)* 235 *F.* 757; *State v. Chapman,* 69 *N. J. L.* 464, 55 *A.* 94; *Wood v. Security, etc., Co.,* 112 *Neb.* 66, 198 *N. W.* 573, 34 *A. L. R.* 712. The right is universally recognized as a right of property. It is not an absolute right, for it is qualified to the extent that the sovereign power may interfere with its enjoyment through necessary and proper regulations for the good of society as a whole; but its enjoyment may not be interfered with unreasonably or arbitrarily, and it may be limited only to the extent necessary to subserve the public interest.

The work, now known as beauty culture, in many of its aspects, has been performed from time immemorial

as of common right; but there are many trades and occupations which, in the progress of civilization, have become so intimately connected with every day life as to be affected with a public interest for the reason that they reasonably relate to the public health and safety, and are, therefore, subject to reasonable regulation. Barbering is an example. *State v. Zeno*, 79 *Minn.* 80, 81 *N. W.* 748, 48 *L. R. A.* 88, 79 *Am. St. Rep.* 422; *State v. Tag*, 100 *Md.* 588, 60 *A.* 465; *Patton v. City of Bellingham*, 179 *Wash.* 566, 38 *P.* 2d 364, 98 *A. L. R.* 1076; *State v. Sharpless*, 31 *Wash.* 191, 71 *P.* 737, 96 *Am. St. Rep.* 893; *Cooper v. Rollins*, 152 *Ga.* 588, 110 *S. E.* 726, 20 *A. L. R.* 1105; *State v. Briggs*, 45 *Or.* 366, 77 *P.* 750, 78 *P.* 361, 2 *Ann. Cas.* 424; *People v. Logan*, 284 *Ill.* 83, 119 *N. E.* 913; *Hanzal et al. v. City of San Antonio*, (*Tex. Civ. App.*) 221 *S. W.* 237.

Like barbering, beauty culture is an occupation which operates directly on the person. It affects the public health, comfort and safety which is endangered by the possibility of spread of communicable diseases and by ignorant and unsanitary practices; and we have no difficulty in concluding that the occupation is one subject to reasonable regulation by the State under its police power. 7 *Am. Jur.* 613; *State v. Reeve*, 104 *Fla.* 196, 139 *So.* 817, 79 *A. L. R.* 1119; *Baker v. Daly*, (*D. C.*) 15 *F.* 2d 881.

The defendant does not contend that the occupation is not subject to reasonable regulation, but does assert that the regulation authorized by the act is unreasonable and oppressive.

The police power is far reaching and elastic. It embraces everything essential to the public health, safety and morals. It is the source from which the Legislature derives its authority to regulate and control professions, trades, occupations and businesses. It is not, however, without limits, and a limitation of the power is the due process clause of the *Fourteenth Amendment* to the *Federal Consti-*

*tution,* which requires that the regulation be reasonable, and that the means of regulation shall have a real and substantial relation to the object to be obtained. The *Seventh Section* of the *Bill of Rights,* as contained in the *Delaware Constitution,* affords the same guaranty.

To justify the State in interposing its authority in behalf of the public, it must appear that the interests of the public, as distinguished from those of a particular class, demand such interference; that the means employed are reasonably necessary for the accomplishment of the purpose; and that they are not unduly oppressive on individuals. The Legislature may not, under the guise of protecting the public interest, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations; nor is the determination by the Legislature as to what is a proper exercise of its police power final and conclusive, but is subject to supervision by the courts. *Lawton v. Steele,* 152 *U. S.* 133, 14 *S. Ct.* 499, 38 *L. Ed.* 385; 6 *R. C. L.* 241; 2 *Cooley Const. Lim., Ch.* 16. If, then, the means employed are arbitrary and unreasonable, and beyond the necessities of the case, the courts will disregard mere forms, and will interfere for the protection of rights injuriously affected by such illegal action, *Minnesota v. Barber,* 136 *U. S.* 313, 10 *S. Ct.* 862, 34 *L. Ed.* 455; for they may and should look at the substance of things whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. *Mugler v. Kansas,* 123 *U. S.* 623, 8 *S. Ct.* 273, 31 *L. Ed.* 205.

The declared purpose of the act is to promote the public health and safety by providing for examination and registration of those who may desire to engage in the occupation of beauty culture.

The age limit of 16 years for operators and 18 years for teachers and managers, is relatively unimportant. The provisions have a more direct and substantial relation to

the welfare of the licensees than to the public welfare. But, conceding that the age limitations are, to some degree, conducive to the general welfare, it is impossible, having regard for the protection of the public, to perceive the consistency or propriety of the provisions of *Section* 8 of the act, which, in certain cases, permit the granting of certificates of registration without compliance with the requirements as to age.

It has been pointed out that there are two ways, apart from those in a favored class under *Section* 6 of the act, by which one may qualify for permission to take an examination for an operator's certificate, the one by having "had training" at a beauty school, the other, by service as an apprentice for at least two years; that the act fails to define a beauty school or to make any requirement of system, course, or length of training as a condition of registration by the Board, or for the student who desires to base his right to an examination by attendance thereat; and that it fails to inform students, applicants, and the public as to what is meant by the terms and phrases, "education," "preliminary education," and "studies necessary to become an operator." If a school is not registered by the Board, it makes no difference, as it would seem, how excellent it may be, for the applicant for examination who depends upon training in an unregistered school is denied the right to an examination.

Those desiring to qualify for the right to take an examination through apprenticeship must serve as an apprentice for at least two years, and to them the way is hard indeed. Persons permitted to instruct apprentices are cosmetologists, cosmeticians and hairdressers who are holders of teachers' certificates *and*, at the same time, owners of beauty shops. Not to stop there, no shop may have more than one apprentice unless it employs two or more operators, and in that case, the number is limited to one apprentice

for each two operators. It would seem clear enough that, in a free country, any one may own, or be the proprietor of, a beauty shop; and it may be supposed that there are owners or proprietors who are not qualified to practice, or teach beauty culture, or to manage a shop. A mere owner of a shop, not qualified through training or experience in the occupation, very properly, may not be allowed, in the public interest, to teach an apprentice. But, conversely one holding a teachers' certificate, no matter how capable, is not allowed to give instruction unless he or she is owner of a shop. It is beyond comprehension how ownership of a beauty shop, as a condition of the right to instruct apprentices, reasonably relates to the public health and safety. And, further to show the inconsistency of the provisions of the act which, as it may be supposed, were inserted to secure proficiency by requiring an apprenticeship of two years, one who had practiced beauty culture in this State for six months only next preceding the effective date of the act and was thus engaged at the time, was entitled to secure a certificate of registration without examination or compliance with requirements as to age and education, provided application was made within ninety days.

It does not appear other, from the language of the act, than that the service as an apprentice must be continuous. If the language is thus to be construed, that alone would seem to be an unwarranted restriction in the right to engage in a lawful occupation. But, however construed, knowledge and proficiency in beauty culture may be acquired other than by having "had training" at a school, or through service as an apprentice. For illustration, take the case of a ladies' maid, thoroughly capable through years of service under an exacting mistress. She loses her place and seeks to earn her living in the only occupation in which she is competent. She must either seek training in a registered school for an undetermined length of time, which her means

may not allow, or seek one who, being both owner of a shop and holder of a license to teach, is willing to take her as an apprentice.

These provisions are arbitrary and unreasonable. As said in *State v. Walker,* 48 *Wash.* 8, 92 *P.* 775, 776, 15 *Ann. Cas.* 257, where a somewhat similar provision of a statute regulating barbers was under consideration,

"We think the provision quoted is both unreasonable and arbitrary. What the public is interested to know is that the barber is competent. How he has acquired his skill or knowledge is of minor importance. If he has qualified himself by attendance upon some school for that purpose, or by his own efforts unassisted, or by having served an apprenticeship under some qualified barber, or in some other equally efficacious way, that is all that can reasonably be required of him. To limit the qualification to one particular way or to one particular place, where there are many universally recognized as equally good, and provide that none others need apply, is no doubt unreasonable."

In *Marx v. Maybury,* (*D. C.*) 30 F. 2d 839, 841, the constitutionality of a statute of the state of Washington, *Chapter* 75, *p.* 229, of the *Laws of* 1923, as amended by *Chapter* 211, *p.* 315 of the *Laws of* 1927, relating to barbering was attacked on the ground that its provisions with respect to barber schools and the courses of instruction to be given therein, and limiting the number of student apprentices in a shop, were unreasonable restrictions on the liberty of the citizen. Both provisions were held void. As to the first provision, the court said, "If the limiting of the number of apprentices to one to each barber shop, whether the number of barbers in a particular shop be one, or a dozen, or more, has even a remote bearing upon public health, it is so remote we are unable to see it." And, with respect to the second provision, the court observed, "While *Section* 14 on its face appears to make elaborate provision to guard the health of patrons of barber shops, it is difficult to avoid the impression that its practical effect is to limit the number of barber schools or colleges, and the number of students,

graduates, or apprentices. * * * Nor is it apparent how the public health is to be protected by the age restrictions." Generally, it was said that there would be a stronger appeal to a court called upon to protect asserted constitutional rights, if such regulations were to be administered by the recognized and qualified health authorities, rather than by persons engaged in the trade or occupation and not presumed to have any special qualification, further than as acquired in the ordinary learning or plying the occupation.

In *People v. Ringe,* 197 *N. Y.* 143, 90 *N. E.* 451, 454, 27 *L.R.A.* (*N.S.*) 528, 18 *Ann. Cas.* 474, a statute regulating undertakers provided that a person not already engaged in the business of undertaking should not be licensed unless duly licensed as an embalmer, and had been employed as an assistant to a licensed undertaker continuously for a period of at least three years. It was held, first, that the attempt to compel an undertaker to secure a license as an embalmer before engaging in the practice of his profession unconstitutionally interfered with his liberty. And, in considering the period of service as an assistant required by the act, the court, in holding the provision void, said that it unnecessarily interefered with the common law right to engage in a lawful business, as it made the particular form of acquiring skill and knowledge essential, and forfeited the right to count the time so engaged in that particular education at each time when there is a break in the continuity of the service. The court added,

"We cannot refrain from the thought that the act in question was conceived and promulgated in the interests of those then engaged in the undertaking business, and that the relation which the business bears to the general health, morals, and welfare of the state had much less influence upon its originators than the prospective monopoly that could be exercised with the aid of its provisions."

To the contrary, in *People v. Logan, supra,* a requirement of three years' apprenticeship, or study for three years at a barber school, was held not to be so unreasonably long

as to constitute an unreasonable restriction upon the right to engage in the trade. With this conclusion we do not agree.

*Patton v. City of Bellingham, supra, Baker v. Daly, supra,* and *Chaires v. City of Atlanta,* 164 *Ga.* 755, 139 *S. E.* 559, 55 *A. L. R.* 230, are not without point in the consideration of the question of a reasonable regulation of a lawful occupation.

*Section* 7 of the act makes it unlawful for any person to practice beauty culture for pay in any place other than a registered beauty shop, but permits a registered operator to give beauty culture treatments to persons in residences of such persons by appointment. Literally, the phrase, "to persons in residences of such persons," confines the right to give treatments to persons actually residing in the place of residence, and it would exclude the right of registered operators to improve the appearance of a guest or friend at the place of residence. With the proviso of the section we are not concerned. The primary part of the section admits of many inferences. Strictly construed, a servant in a household, fully competent, receiving additional compensation for work in the category of beauty culture but outside of her regular employment, is amenable to the law if she serves her mistress or a guest or friend in the house; and likewise, one fully competent, who serves specified individuals only and not the public generally, runs counter to the law unless he or she is a registered operator.

Courts should be careful to sustain the proper exercise of the police power for the protection of the public health and safety, and, in so doing will not hesitate to overthrow or limit private rights in conflict therewith. On the other hand, Courts will freely interpose by judicial veto, when a lawful occupation is unreasonably and arbitrarily interfered with or restricted under the guise of protecting the public welfare.

 The provisions of the act with respect to apprentices and to those permitted to give them instruction were not designed to protect the public, but to serve the interests of the trade by unreasonably limiting the number of apprentices, thereby drying up one of the sources of supply of operators. The sweep of the act generally is not restricted to safeguarding the public welfare. The complexity of the system of registrations, examinations, exemptions, limitations and prohibitions is such as to compel the conclusion that the underlying purpose of the originators of the act was to promote the interests of those engaged in the occupation, the public interest being substantially incidental. Beauty culture is not one of the learned professions. It is a quite common occupation in many of its features. The manner and extent of its regulation ought not to be out of balance with a common sense regard for the protection of the public health. The act, considered as a whole, is unreasonable and oppressive. It far exceeds the necessity that may exist to protect the public against ignorance and unsanitary practices. The provisions which have been particularly considered have no substantial relation to the public health and safety; and the result of the undefined and unlimited authority conferred upon the administrative board, all the members of which are engaged in the occupation, with respect to students, schools, apprentices, operators, teachers and managers, is to center control of the entire trade in the Board of Examiners and its licensees. The declared purpose of the act is subservient to its real purpose, which is to erect a monopoly, to create a guild, a thing inimical to the public interest.

It is clear that a complete system was intended to be established for the regulation and control of the occupation. Its provisions are so intertwined, and so dependent one upon the other, that they are not separable; and it is apparent that the Legislature intended the act to operate as a

whole. The inference may be drawn also, that its parents would have had little interest in it except for its monopolistic features.

The conclusion must be that the act, as it is written is void, in that it delegates legislative power to the Board of Examiners; and is an unconstitutional exercise of the police power of the State, in that it invades unwarrantably the right of the citizen to engage in a lawful occupation.

The judgment of conviction is reversed.