ATLANTIC RICHFIELD COMPANY, a corporation of the State of Pennsylvania, and Exxon Corporation, a corporation of the State of New Jersey, Plaintiffs,

v.

Sherman W. TRIBBITT, Governor of the State of Delaware, Richard R. Wier, Attorney General of the State of Delaware, John D. Daniello, Secretary of the Department of Community Affairs and Economic Development, Frances M. West, Director of the Division of Consumer Affairs of the Department of Community Affairs and Economic Development, John Doe, Administrator of the Office of Retail Gasoline Consumer Affairs, Defendants.

Court of Chancery of Delaware, New Castle.

Submitted May 11, 1977.

Decided Aug. 25, 1977.

536

Louis J. Finger, and Allen M. Terrell, Jr., of Richards, Layton & Finger, Wilmington, for plaintiff Atlantic Richfield Co.

Thomas Herlihy, Jr., of Herlihy & Herlihy, Wilmington, and Robert G. Abrams, William Simon, and Stuart H. Harris, of Howrey & Simon, Washington, D. C., for plaintiff Exxon Corp.

A. Gary Wilson, and Carolyn Berger, Dept. of Justice, Wilmington, for defendants.

BROWN, Vice Chancellor.

In this consolidated action plaintiffs Atlantic Richfield Company and Exxon Corporation have sought a declaratory judgment and accompanying injunctive relief against the Governor and other State officials to prohibit the enforcement of certain provisions of the Retail Sales of Motor Fuel Statutes found at 6 *Del.C.* §§ 2901–2911. Plaintiffs attack the constitutionality of the statutes set forth hereafter for a variety of reasons. Specifically, they contend that the action of the General Assembly constitutes an excessive and arbitrary use of the police power of the State and thus a violation of the Fourteenth Amendment of the United States Constitution and Article 1, Section 7 of the Delaware Constitution; that the statutes deny them equal protection of the law in violation of the same constitutional provisions; that the statutes conflict with the Commerce Clause of the Federal Constitution; that the statutes violate the Supremacy Clause of the Federal Constitution; that the statutes constitute a taking of property without just compensation in violation of the Fourteenth and Fifth Amendments of the Federal Constitution and Article 1, § 7 of the Delaware Constitution; that the statutes are void because of vagueness in the terms employed, again in violation of constitutional due process; and that the statutes impair the obligation of contracts in violation of Article 1, Section 10 of the Constitution of the United States. The parties have stipulated to certain facts and the matter is now before the Court on the motion of the plaintiffs for partial summary judgment.

The act in question was passed by the General Assembly and signed into law by the Governor on July 29, 1974. No record of legislative history or debate on the questioned legislation has been presented, and there is nothing in the record before the Court to show the purpose of the act except for a statement of one of its sponsors contained in a newspaper article of June 4, 1974, in which he was quoted as saying that the "object of this legislation is to save the neighborhood gas stations." The article further indicated that the proposed bill was designed to free gas dealers from many of the restrictions forced upon them by their suppliers. The legislation was branded in the newspaper article as being a "retail gas dealers' bill of rights." Plaintiffs assert that this graphically illustrates that the statutes here in question constitute discriminatory class legislation designed to protect the interest of a certain segment of the business community rather than to promote the health, safety and welfare of the people in general. As such, plaintiffs contend that it is arbitrary and capricious and therefore

an abuse of the police powers of the State, and thus a denial of both due process and the equal protection of the law. They further contend that it is in direct conflict with the provisions of the Emergency Petroleum Allocation Act of 1973, 15 *U.S.C.* §§ 751 et seq., which is preemptive in the area of gasoline supply regulation, and that it also deprives them of a defense, and thus a right, otherwise available to them under the provisions of the Robinson-Patman Act, 15 *U.S.C.* § 13, thus leaving them in a position whereby compliance with the Robinson-Patman Act would put them in violation of the Delaware statutes while compliance with the Delaware statutes would compel them to violate the provisions of the Robinson-Patman Act.

The well-argued positions of the parties and the complexity of the theories advanced renders the matter difficult to handle. However, having considered the arguments and authorities submitted at some length, I am of the opinion that the decisional process here has been expedited as a result of a development which has taken place since the inception of this litigation. Plaintiffs originally relied upon two recent decisions in Florida and Maryland, both of which had held that statutes similar to the ones here under attack were unconstitutional for at least some of the reasons urged by the plaintiffs here. Since that time, however, the Maryland decision has been reversed by the Maryland Court of Appeals in a lengthy and exhaustive opinion found at *Governor of Maryland v. Exxon Corp.,* Md.Ct.App. 279 Md. 410, 370 A.2d 1102 (1977) and, since I concur with the reasoning of that Court for the most part, the majority of the aforesaid arguments in this case can be disposed of by reference to that decision without the necessity of plagiaristic repetition.

### I.

Because the Maryland decision deals with statutes which correspond with only a portion of those involved in the present motion, I will divide the treatment of the problem into two sections, limiting the first to the two Delaware statutes which appear to correspond in their stated intent with those upheld by the Maryland Court. These Delaware statutes are found as follows at 6 *Del.C.* § 2905 and 6 *Del.C.* § 2906:

"§ 2905. Independence of retail dealers.

"(a) No manufacturer of petroleum products shall open a major brand, secondary brand or unbranded retail gasoline outlet or service station in the State, that would be operated by company personnel, a subsidiary company, or a commissioned agent.

"(b) The Division of Consumer Affairs of the Department of Community Affairs and Economic Development shall adopt rules or regulations defining the circumstances in which a manufacturer may temporarily operate a service station in times of emergency or similar special circumstances."

"§ 2906. Equal treatment.

"(a) Every manufacturer, supplying petroleum products to retail dealers and other retail fuel outlets shall extend all voluntary allowances uniformly to every dealer or outlet supplied.

"(b) Every manufacturer, supplying petroleum products to retail dealers or other retail fuel outlets shall apply all equipment rentals uniformly to all dealers and outlets supplied.

"(c) Every manufacturer, supplying petroleum products to retail dealers or other retail fuel outlets shall apportion uniformly all gasoline and special fuels supplied during periods of shortages, on an equitable basis, and shall not discriminate among dealers and outlets in such allotments."

The definition of the key terms appearing in these two sections are contained as follows in 6 *Del.C.* § 2901:

"(5) 'Manufacturer' shall mean every producer or refiner of petroleum products, or the producer or fabricator of any automotive product sold or distributed by a service station."

\* \* \* \* \* \*

"(8) 'Retail dealer' shall mean and include any person operating a service sta-

tion, filling station, store, garage or other place of business for the sale of motor fuel for delivery into the service tank or tanks of any vehicle propelled by an internal combustion engine."

As can be seen, § 2905 now prohibits a producer or refiner of petroleum products from opening a company operated retail gasoline station in Delaware. § 2906 requires that hereafter all voluntary allowances and equipment rentals to retail dealers shall be uniformly applied and offered by the manufacturers, and that during product shortages fuel allocations shall be uniformly made to all retail outlets in the State on an equitable basis.

A. *Plaintiffs' Argument That § 2905 and § 2906 Exceed The Police Power Of The State.*

Plaintiffs devote substantial effort to the argument that § 2905 and § 2906 exceed the police power of the State because they constitute an arbitrary interference with lawful business practices, and thus violate due process. No attempt is made to argue that the State is without the power to regulate the petroleum industry; rather, the thrust of plaintiffs' argument is that this particular piece of legislation is inadequate to satisfy the demands of substantive due process under Delaware law.

In this regard, a preliminary conflict has developed between the parties as to the applicable standard of review under that portion of the *Delaware Constitution of 1897* which mandates that a person may not be deprived of liberty or property without due process of law.[1] Plaintiffs take the view that in the area of economic legislation the federal courts have adopted a "hands-off" approach so as to permit state legislatures and courts to be the final judges of their own legislation. Theoretically, this allows state courts to scrutinize state economic legislation with greater care than federal courts. See Hetherington,

*State Economic Regulation and Substantive Due Process of Law,* 53 N.W.U.L.Rev. 226 (1958); Paulsen, *The Persistence of Substantive Due Process in the States,* 34 Minn. L.Rev. 91 (1950). This, say plaintiffs, has long been recognized in Delaware and consequently the standard of review to be applied by this Court is more restrictive than that which presently exists under federal standards.

Plaintiffs argue that beginning at least with *Hoff v. State,* Del.Super., 197 A. 75 (1938) the Delaware courts have articulated a test not dissimilar to that set forth by the United States Supreme Court in *Lawton v. Steele,* 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894). In *Hoff* it was stated as follows at 197 A. 82:

"To justify the state in interposing its authority in behalf of the public, it must appear that the interests of the public, as distinguished from those of a particular class, demand such interference; that the means employed are reasonably necessary for the accomplishment of the purpose; and that they are not unduly oppressive on individuals. The Legislature may not, under the guise of protecting the public interest, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations; nor is the determination by the Legislature as to what is a proper exercise of its police power final and conclusive, but is subject to supervision by the courts. [Citations omitted.] If, then, the means employed are arbitrary and unreasonable, and beyond the necessities of the case, the courts will disregard mere forms, and will interfere for the protection of rights injuriously affected by such illegal action [Citation omitted] *for they may · and should look at the substance of things* whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority." (Emphasis added.)

---

1. The Delaware Constitution does not contain an express reference to "due process" as does the United States Constitution. However, the phrase "law of the land" contained in Article I, § 7 of the Delaware Constitution has been held to have substantially the same meaning as the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution. *In Re Opinion of the Justices,* Del.Supr., 246 A.2d 90 (1968).

To the same effect, see *State v. Danberg,* Del.Gen.Sess., 6 A.2d 596 (1939); accord, *Becker v. State,* Del.Super., 185 A. 92 (1936).

In *State v. Hobson,* Del.Supr., 83 A.2d 846 (1951) the Delaware Supreme Court held unconstitutional a statute which sought to regulate the retail sale of motor fuels by establishing uniform regulations respecting permissible size and location of signs indicating the selling price of such fuels. At 83 A.2d 855 it was stated as follows:

"The [police] power is always subject to express or implied constitutional prohibitions; but where not so restrained, the exercise of the power depends upon whether the situation presents a *reasonable necessity* for the protection of the public welfare, and whether the means adopted bear a *reasonable relation* to the end sought to be accomplished. Within these limits, the court will not assume to disturb the legislative action." (Emphasis added.)

In *Rogers v. State,* Del.Supr., 199 A.2d 895 (1964) the Delaware Supreme Court, in reviewing a statute designed to prevent barbering on Sunday, adopted and applied the above-quoted language from *Hoff v. State.* After noting that the statute in question contained no statement of legislative purpose, the Court went on to analyze the legislative justifications suggested as possibilities by the State. Finding them to be obviously illogical, it was concluded as follows at 199 A.2d 897:

"To paraphrase *Hoff v. State,* supra, the provision was designed not to serve the public but to serve the interest of a part of the trade by restricting competition and arbitrarily imposing the wishes and desires of some members of that trade upon others.

\* \* \* \* \* \*

"It is our opinion, therefore, that [the statute] constitutes an unjust and unreasonable attempt to discriminate against this class of persons; that its effect is not to benefit the interests of the public; and that it constitutes an arbitrary interference with private business. It is accordingly a violation of both the Fourteenth Amendment of the Federal Constitution and Article I, Section 7 of the Delaware Constitution."

*Hoff v. State, supra,* was also cited with approval in *Globe Liquor Co., v. Four Roses Distillers Company,* Del.Supr., 281 A.2d 19 (1971), *cert. den.* 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117 (1971) as was *Mid-Penn National Mortgage Company v. Hughes,* Del. Super., 258 A.2d 291 (1969) *aff'd, Green v. Mid-Penn National Mortgage Co.,* 268 A.2d 876 (1970) which relied in part on both *Hoff* and *Hobson.* Most recently, *State v. Hobson* was cited with regard to the scope of judicial inquiry into legislation in *Kreisher v. State,* Del.Supr., 303 A.2d 651 (1973).

From this plaintiffs reason that the substantive due process standard continues to exist in Delaware and that the constitutional validity of a legislative exercise of the police power for the purpose of regulating economic activity is subject to a three-pronged test requiring (1) a "reasonable necessity" for the imposition of a restraint in order to protect a public rather than private interest; (2) a means to carry out such restraint which does not arbitrarily interfere with private business or impose unusual or unnecessary restrictions upon lawful occupations; and (3) a means which bears a "reasonable relationship" to the end sought to be accomplished. Plaintiffs argue that when examined against this standard, the challenged portions of the Act must fall since the record reveals neither a necessity for it nor the reasonableness of its relation to any evils it sought to correct. Further, they contend that it was enacted solely to protect private rather than public interests.

Defendants, on the other hand, take the position that the basis for the Delaware decisions on which plaintiffs rely have been eroded and that while the earlier decisions of *Hoff* and *Hobson* continue to be cited with approval, they are no longer followed in practice. Defendants argue that the standard for judicial review of economic legislation is the same under both the State and Federal Constitutions and that this

standard, which should be applied here, establishes that economic legislation may be held invalid only where it runs afoul of some specific constitutional prohibition or some valid federal law. In the absence of a direct conflict, it is presumed to be valid and will be upheld if there is any conceivable set of facts which would justify and support it.

■ The defendants point out that in *Hobson* the State argued that the "reasonable necessity—reasonably related" test had been repudiated by the federal courts in construing the due process clause of the Fourteenth Amendment and that accordingly it should have also been repudiated by the Delaware Supreme Court in construing the analogous provision of the Delaware Constitution. In rejecting this argument in *Hobson* the Court observed at 83 A.2d 856–857:

> "The field of judicial review of the reasonableness of legislation under the due-process clause of the Fourteenth Amendment has certainly been greatly narrowed [Citations omitted], but it does not appear to have been abolished."

Defendants suggest, however, that in the course of the 25 years since *Hobson* was decided, it has become clear that the reasonableness of economic legislation by a state is no longer an element for examination under federal law and that consequently, *Hoff, Hobson* and their progeny are no longer congruent with existing Fourteenth Amendment standards. *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955) *reh. den.*, 349 U.S. 925, 75 S.Ct. 657, 99 L.Ed. 1256 (1955); *Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973). Even a cursory reading of these three decisions of the United States Supreme Court indicates that defendants' viewpoint of the federal approach is correct.

In *Williamson v. Lee Optical of Oklahoma*, a federal District Court had struck down a statute regulating the sale of eyeglasses after concluding that "the particular means chosen are neither reasonably necessary nor reasonably related to the end sought to be achieved." In reversing, the Supreme Court stated as follows at 348 U.S. 487, 75 S.Ct. 464, 99 L.Ed. 56:

> "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."

In reiterating this principle in *Ferguson v. Skrupa*, the Court said as follows at 372 U.S. 730, 83 S.Ct. 1031, 10 L.Ed.2d 97:

> "It is now settled that States 'have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or some valid federal law.'"

Finally, in the *Snyder's Drug Stores, Inc.* decision, the Supreme Court upheld a North Dakota statute which required that pharmacies be operated only by registered pharmacists or by corporations owned by registered pharmacists. In so doing, the Court expressly overruled a factually similar 1928 decision in which it had held that business or property rights could be regulated under the Fourteenth Amendment only if the legislation bore a "real and substantial relation" to the public health, safety and welfare. The express rejection the earlier case was said to be done to free the courts and agencies of North Dakota from what that State's Supreme Court deemed to be the mandate of the standard set forth in the earlier precedent.

Defendants argue that these cases clearly establish that *Hobson's* reading of the Fourteenth Amendment is no longer valid. They suggest that the true basis for *Rogers v. State, supra*, was a denial of equal protection, not due process. Likewise, while the Court in the *Globe Liquor Co.* case made reference to the reasonableness test articulated in *Hoff*, it decided the case upon the grounds of impairment of contracts and

unlawful taking, noting in the process with regard to the equal protection argument at 281 A.2d 23:

"If *any facts can be assumed* which will support the classification, then *that assumption must be made* to uphold the classification." (Emphasis added.)

And in *Kreisher v. State, supra*, where it was contended that hashish had not been shown to be a dangerous drug within the meaning of the challenged criminal statute and that consequently it was beyond the constitutional power of the General Assembly to control it, the Court, in rejecting this argument, stated as follows at 303 A.2d 652–653:

"The wisdom of legislative policy is not a matter of judicial review. *Sibbley v. State*, Del.Supr., 9 Terry 289, 102 A.2d 702 (1954). Each legislative enactment is cloaked with the presumption of constitutionality. *Klein v. National Pressure Cooker Co.*, Del.Supr., 31 Del.Ch. 459, 64 A.2d 529 (1949). *It is not necessary to find that a state of facts exists which would justify it.*" (Emphasis added.)

Finally, defendants refer to *Justice v. Gatchell*, Del.Supr., 325 A.2d 97 (1974) where the Court, in rejecting an attack on the Guest Statute, stated as follows at 325 A.2d 102:

"On the basis of the record before us, even on the basis of information of which we might take judicial notice, we are unable to say that there are no longer any evils to be corrected, or permissible objectives to be accomplished, by the Guest Statute. Whether the concept of hospitality-protection or collusion-prevention has been so eroded by changing conditions, as to have disappeared as acceptable justification for the Guest Statute, is a problem more appropriate for legislative solution than for judicial determination. *The General Assembly has access to relevant information bearing upon these matters more significant than any afforded this Court, bound as it is by the limitations of the record of this judicial proceeding.*" *Id.*, at page 102. (Emphasis added.)

Thus, defendants argue that by virtue of decisions through *Justice v. Gatchell* the Court has abandoned all pretense of determining whether there is a reasonable necessity for a social or economic statute or whether the statutory remedy bears a reasonable relation to the end sought to be accomplished. Again, they urge that despite lip service to earlier precedents the due process test in evaluating action taken under the police power of the State is now the same as the federal standard, namely, that so long as the statute does not conflict with either a specific constitutional limitation or a valid federal law, economic legislation must be upheld if there exists any conceivable set of facts which would justify it.

Whether or not the Delaware Supreme Court has backed off from its former "substantive due process" test for social legislation is not for me to say. Defendants make a strong case that it has. However, it seems unnecessary for the present issue to turn on that determination because even under the *Hobson, Hoff* and *Rogers* standards I am satisfied that the legislation is a justifiable exercise of the police power. Going back to *Hobson*, it was there stated at 83 A.2d 856 that in applying the "reasonable necessity—reasonably related" test

". . . the rule is that every presumption is in favor of the validity of a legislative act and all doubts are resolved in its favor. [Citations omitted.] And if the question of reasonable necessity for the regulation is 'fairly debatable, the legislative judgment must be allowed to control.' [Citation omitted.] The court is not required to find that a state of facts exists which justifies the legislation; it is sufficient if a state of facts may reasonably be conceived which would justify it."

For a contemporary statement to the same effect, see *Justice v. Gatchell, supra*. Thus, assumed or conceivable factors which would justify economic legislation as being in the best interests of the people appear to be an accepted starting point under either approach. Compare *Williamson v. Lee Optical of Oklahoma, supra*.

In furtherance of their claim to a right of substantive evaluation by this Court, plaintiffs contend that § 2905 and § 2906 bear no reasonable relationship to the health, safety, morals or welfare of the people of Delaware. Since § 2905 forbids producers and refiners of petroleum products from opening and operating retail gasoline stations hereafter, it obviously eliminates plaintiffs from direct competition in the retail gasoline business except to the extent of company operated stations already in existence. Plaintiffs say that this reduces competition and thus is not in the public interest. Moreover, it deprives the public of new innovations in the retail market since manufacturers will no longer be able to experiment with new types or combinations of gas station-car washes, gas station-restaurants and combination automotive care centers. They point out that independent retailers and lessees are not financially in a position to take such gambles and that consequently, to prohibit the financially-able oil companies from doing so deprives the public of the ability of the gasoline industry to change with the times. They also point out that company operated stations have traditionally been used as training grounds for persons desiring to get into the business and to operate their own station as lessee of the parent oil company, a factor which substantiates the continued use of company operated stations. They suggest that the Act effectively bars the entry of additional oil companies into the Delaware market, particularly some of the smaller ones which only do business through company owned and operated stations, a factor which also reduces competition. As to the mandate of § 2906 that all voluntary price allowances and all equipment rentals be uniform, plaintiffs assert that this will result in a price rigidity which can only hurt the consumer and which will also prohibit temporary price assistance to independent dealers in the event of economic hardships beyond their control. They say that these consequences will be the result of legislation which, according to its sponsor, was passed solely to protect independent retail gasoline dealers and that in view of this the Court, under

the substantive due process test, should hold that such far reaching action was unnecessary to protect such a small segment of the business community and that the means chosen, being to the eventual detriment of the motoring public and other retail operators, is not reasonably related to the evil sought to be cured.

In fact, this is what was done by the Florida court in *Exxon Corp. v. Conner,* Case No. 74–1449, Cir.Ct. of the Second Judicial Cir. in and for Leon County, Florida (January 23, 1975) which, based on the foregoing arguments, concluded that no protection to the public was evident, that the law was discriminatory against company operated stations, and that consequently it was an unconstitutional attempt to exercise the police power of the state in violation of due process protections. In so doing, it must be noted that the Florida court chose to overrule the determination of the state legislature as to what would be in the best interests of the public, something our precedents indicate that our courts should not do, at least if the necessity for the regulation is fairly debatable.

The other side of the matter seems ably illustrated in *Governor of Maryland v. Exxon Corp., supra.* Unlike the record in the present case, the court there had the benefit of the history and purpose of the legislation. Because of the existing fuel shortage being experienced in Maryland during 1973 and because of complaints to his office, an inquiry into the Maryland situation was ordered by its Governor. The results revealed that during the crisis the independent retail dealers had fared the worst in receiving petroleum products for resale while the company-owned and operated stations experienced virtually no problems at all. The report also revealed that independent dealers were forced out of business as a result and that a noticeable increase in company-owned operations was developing within the state. These factors were further brought out in both legislative and gubernatorial hearings prior to the passage of the Maryland statutes (which, in their various parts are almost identical with the lan-

guage of § 2905 and § 2906 of the Delaware Act[2]). In reversing the trial court the Court of Appeals observed as follows at 370 A.2d 1112:

"Here the Legislature was presented with evidence that refiners and producers were favoring company operated stations in the allocation of gasoline. The Comptroller's report showed that, because of the inability to obtain adequate supplies of gasoline, some service station dealers were forced to close. Evidence was also presented that many dealer operated stations were being converted to company operation. The Legislature could reasonably conclude that control of the retail gasoline market by producers and refiners would decrease competition and that the continued existence of independent retail dealers was necessary to preserve competition. Exclusion of producers and refiners may conceivably be a reasonable means of preserving competition and preventing monopolistic control of gasoline marketing by a few large oil companies. * * * Indeed, in *Federal Trade Comm'n v. Sun Oil Co.*, 371 U.S. 505, 528, 83 S.Ct. 358, 371, 9 L.Ed.2d 466 (1963), the Supreme Court recognized that elimination of retail service station dealers through forward vertical integration may be an 'evil' requiring legislative action."

Recently, the Congress of the United States has expressed similar concern for the survival of the nonintegrated sector of the petroleum industry. In the Emergency Petroleum Act of 1973, 15 *U.S.C.* § 751, et seq., it is made clear at § 753 that regulations adopted thereunder for the allocation of crude oil should provide for the competitive viability of both branded and nonbranded independent marketers. The Congressional Committee which drafted the legislation did so, in part, based on the following findings:

"The Committee is especially concerned with the downstream vertical integration of the major oil companies into the distribution and retail levels of the market.

Major oil companies have begun to market secondary brands through wholly-owned distribution subsidiaries. The primary brands are to an increasing extent being marketed through so-called salaried or managed retail outlets. Branded independent marketers, already under short term lease and supply agreements, are finding that their agreements are not being renewed."

The Committee further noted that

"These enterprises have an importance to the United States economy far out of proportion to their market shares, because they continually spur the major integrated firms to improve their own efficiency in the production, refining, transportation and marketing of products."

See 1973 U.S.Code Cong. & Admin.News p. 2595.

If the basic test is to ascertain whether or not there exist factors which could conceivably justify the General Assembly in invoking the police power of the State so as to regulate a segment of its commercial community for the general welfare and protection of the people, then it is not difficult to assume that for similar reasons in 1974, after having just passed through a nationwide gasoline crisis with accompanying disruption to the Delaware market, our General Assembly was genuinely concerned as to the survival of the independent retail gasoline dealer as well as with the potential monopolistic consequences of increased company-owned operation which could be more easily accomplished so long as the producers and refiners were in a position to extend price and allocation benefits to some retail operations without extending the same benefits to others.

■ A statute will not be declared void unless its invalidity is established beyond doubt, and the burden of so showing is cast upon the one who challenges it. *State v. Hobson, supra; Justice v. Gatchell, supra.* The affidavits and evidentiary matters offered by plaintiffs contain much that is

---

2. See Maryland Code (1957, 1972 Repl.Vol., 1976 Cum.Supp.), Art. 56, § 157E as well as

*Governor of Maryland v. Exxon Corp., supra,* at 370 A.2d 1106.

worthy of consideration by those who would undertake the responsibility of passing laws such as those here in question. In sum, however, these evidentiary materials, as I view them, are comprised in their offered import of a variety of legal conclusions, opinions as to the negative effect of the act, and statements intending to demonstrate the good intentions of the plaintiffs not to engage in the type of conduct at which the act can be said to be justifiably directed. It may well be that prior to some actual experience under the statutes this is the best record plaintiffs can offer. Nonetheless, I am not convinced on the present record and arguments that plaintiffs have carried the burden required of them to establish the unconstitutionality of the enactments.

■■■ Accordingly, I conclude that § 2905 and § 2906 are not invalid as being an abuse of the police power and a denial of due process by the State.

### B. *Plaintiffs' Remaining Arguments As To § 2905 and § 2906.*

■■ As to plaintiffs' remaining challenges to 6 *Del.C.* §§ 2905 and 2906, I am satisfied to adopt the reasoning of the Maryland Court of Appeals as being dispositive of the issues here. In summary, § 2905 and § 2906 do not violate the Commerce Clause of the Federal Constitution because they do not limit or affect the flow of gas into or out of the state; rather they only regulate an intrastate activity, namely, who may engage in the retail sale of gasoline hereafter. The effect of the legislation is not to protect Delaware business interests to the exclusion of out-of-state interests since its control applies to both resident and nonresident producers and refiners of petroleum products alike.

■■ The statutes do not amount to an unconstitutional taking of property without compensation for the reason that producers and refiners owning retail-gasoline station properties in Delaware are not deprived of the beneficial uses of such properties. They remain free to operate them and to sell their product through others under the type of retail marketing agreement already be-ing utilized at the vast majority of their business locations. As to the argument that the statutes would deprive plaintiffs of property rights by prohibiting them from taking over the operation of a retail station in the event it should be abandoned by the independent retailer leasing it, it seems clear that the provisions of § 2905(b) contemplate the adoption of administrative regulations authorizing operation by producers and refiners on a temporary basis "in times of emergency or similar special circumstances."

■■ As to the equal protection argument, it appears for the reasons discussed previously herein that it can be reasonably conceived that factual necessity exists for prohibiting retail operations by producers and refiners in order to preserve and insure competition in the retail gasoline market, and that the approach selected bears a reasonable relationship to the prevention of the anticipated evil of potential domination of the retail market by large oil companies. Thus, there appears to be a reasonable basis for the classification. Compare *Globe Liquor Co. v. Four Roses Distillers Company, supra.*

■■ The argument that these statutes violate the Supremacy Clause of the Federal·Constitution by attempting to legislate in areas already covered by the Emergency Petroleum Allocation Act of 1973 and by § 2(b) of the Clayton Act as amended by the Robinson-Patman Act also is not persuasive. The Delaware laws are compatible in purpose with the former. The federal act only preempts attempted state regulation which would be in actual conflict. To the extent any conflict should develop through regulations promulgated by the State, they must yield to the federal authority. This does not mean, however, that the Delaware statutes are unconstitutional for this reason.

As to the Robinson-Patman Act, the Maryland Court concluded that the right to limited territorial price discrimination claimed by the plaintiffs under § 2(b) is not available in a situation where a supplier reduces its price to its dealer so as to enable

its dealer to meet the price of a competing dealer. *Federal Trade Commission v. Sun Oil Co.,* 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). The Maryland Court observed and found that the term "voluntary allowance" as used in the petroleum industry covers just this practice. 370 A.2d 1122. consequently, it concluded that since the selective voluntary allowances prohibited by the Maryland law (as also prohibited by the Delaware statute) would not be defensible under the Robinson-Patman Act, there could be no conflict between the state and federal law and therefore no violation of the Supremacy Clause. 370 A.2d 1125.

I recognize that plaintiffs cite *Bargain Car Wash, Inc. v. Standard Oil Co. (Indiana),* 466 F.2d 1163 (7th Cir. 1972) as a case indicating that based on the position now taken by the Federal Trade Commission the § 2(b) defense is available to a supplier which reduces its price to its dealer to enable its dealer to meet the price of a competing dealer who has been granted a price reduction by its supplier. The Maryland Court chose to rely, however, on *Enterprise Industries v. Texas Company,* 136 F.Supp. 420 (D.Comm.1955), *reversed on other grounds,* 240 F.2d 457 (2nd Cir.), *cert. den.* 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957), which held that § 2(b) was available only to enable a supplier to meet the price of a competing supplier offered to the same dealer. The Maryland Court further noted that in deciding the later case of *Federal Trade Commission v. Sun Oil Co., supra,* the United States Supreme Court expressly reserved the question presented in *Bargain Car Wash, Inc.* Thus, a conflict admittedly exists at the federal level on a point which has yet to be addressed by the United States Supreme Court. Since it is the function of a court to construe legislation to be valid if at all possible, it seems to me that the decision of the Maryland Court to rely upon the federal precedent which supports the constitutionality and validity of the state law is the proper one pending ultimate clarification at the federal level.

 As to the argument that the statutes are unconstitutionally vague in using without precise definition such terms as "voluntary allowances," "uniformly," "periods of shortages," and "uniformly . . . on an equitable basis," the Maryland Court found them all sufficiently understandable and definite as not to constitute a denial of due process of law. I concur in this result.

Thus, for the reasons set forth in greater detail in *Governor of Maryland v. Exxon Corp., supra,* at 370 A.2d 1113–1127, I conclude that the plaintiffs' motion for summary judgment based upon the asserted unconstitutionality of § 2905 and § 2906 must be denied.

## II.

Not considered in the foregoing discussion are the following provisions of 6 *Del.C.* § 2909:

"§ 2909. MARKETING AGREEMENTS.

"Every marketing agreement between a manufacturer and a retail dealer shall be subject to the following nonwaivable provisions, whether or not they are expressly set forth in the agreement:

"(1) No agreement shall require a retail dealer to keep his station or outlet open for business for any specified number of hours per day, or days per week.

"(2) The retail dealer shall have the right to cancel a marketing agreement until midnight of the seventh business day after the day on which the agreement was signed, by giving the other party notice in writing of the cancellation. Upon giving the other party such notice, all money, equipment and merchandise loaned, sold or delivered to the retail dealer under the agreement shall be returned to the other party for full credit, or the case equivalent. If the other party to the agreement is the owner of the real estate upon which the retail dealer conducted his business, the dealer shall deliver full possession of the real estate back to the other party.

\* \* \* \* \* \*

"(5) No party to a marketing agreement with a retail dealer shall unreasonably withhold his consent to any assignment, transfer or sale of the marketing agreement; nor may a manufacturer unreasonably refuse to renew a marketing agreement.

"(6) With respect to nonrenewal of a marketing agreement, either party must give the other party notice of intent not to renew the marketing agreement at least 90 days prior to the expiration of the term of that marketing agreement, and shall state the reason for such nonrenewal.

"(7) Notwithstanding any contract provision, no lease agreement or any other contract which bases rent upon the amount of products sold shall permit any increase in such rentals if there is a ceiling on the amount which may be charged for the product.

"(8) If the marketing agreement or rental agreement requires the retail dealer to provide to the manufacturer or other party to the agreement any deposit in advance or any other deposit for the use of the service station or delivery of fuel, such deposit shall be held by the person designated to receive it in the agreement and shall be held for the term of the rental agreement unless it is sooner terminated. Within 30 days after the termination of the agreement the deposit shall be returned, together with interest on such deposit at the rate of 6% per annum."

Plaintiffs, particularly Atlantic Richfield, argue that these provisions of the law impair the obligation of existing contract rights in violation of the federal Constitution and that they also deny equal protection of the law as being invidious class discrimination in favor of retail gasoline dealers at the expense of the property rights of the petroleum suppliers whose premises the retailers lease under marketing agreements. Defendants have chosen not to respond to these arguments, claiming that there is an insufficient factual record on which to make a decision and that a development of the record will produce disputes as to material facts. Needless to say, since the consolidated action had proceeded to summary judgment argument supposedly upon a stipulated factual record, this leaves the Court in a somewhat awkward position. Nonetheless, I conclude that the merits of the foregoing statutes must also be considered, even if solely on the arguments of the plaintiffs.

██ To begin with, to the extent that the law attempts to impose additional conditions on agreement, existing at the time of its adoption, it would be of no effect. This is the holding of *Globe Liquor Co. v. Four Roses Distillers Company, supra,* as applied to the Franchise Security Act found at 6 *Del.C.* Ch. 25. In view of the passage of time since the effective date of the present motor fuel statutes and the customary practice in the petroleum industry for short term leases with renewal rights, this point may now be academic. The more serious issue goes to the right of the State to impose these statutory conditions on retail gasoline marketing agreements consummated after its effective date.

Plaintiffs argue that to deny a petroleum supplier the right to set the hours of operation for its own service stations is clearly class legislation which has no possible benefit to the public. Retailers may well like to stay open only during the hours when gasoline sales are best, but to permit them to do so would limit the ability of the public to purchase gas as needed. While it would save the retailer on overhead expenses to close down during slow traffic hours, there would be no corresponding benefit to the public in the reduction of available open stations. They also point out that rent is usually equated to gallonage sales based on traffic surveys and that consequently the ability to establish a rental rate is inextricably tied to the right of the oil company to fix hours of operations.

Plaintiffs further say that there is no benefit to the public in restricting their right to approve the assignability or transfer of operating interests in their stations by their retail dealers. They argue with

much persuasion that their retail outlets operate with the benefit of their trademarks and tradenames and that consequently, in order to assure their continued goodwill in the market place, they must have the unfettered discretion to decide on who will operate their retail outlets under their names. They say that to the extent that § 2909(5) deprives them of this property right it is pure class legislation in favor of the retail dealers.

The restriction against rent increases imposed by § 2909(7) prohibits a supplier from increasing rent based upon products sold if there is a ceiling on the amount which can be charged for the product. Plaintiffs argue that the right to fix the rent at which they will be willing to enter into a lease of their property is a fundamental property right which can be restricted only for a legitimate public purpose. They suggest that there can be no purpose here other than to benefit a particular class, namely, the retail dealers.

They make similar property interest arguments as to the nonrenewal requirements of § 2909(6) and the one-sided rescission provisions of § 2909(2). Finally, they contend that it is completely improper and illogical to require them to pay 6 per cent interest on security deposits required of retail dealers in order to enter into a marketing agreement. They say that in practice this initial deposit goes to enable the dealer to receive his periodic tankwagon supply of gasoline without having to pay for it at the time of delivery. The dealer is thus in a position to use the receipts from the sale of a load to pay for it after he has received it rather than to pay for it in advance of resale. Since this is a method to assure the retailer a continuing supply of product for resale, and thus is for his benefit as well as for that of the supplier, plaintiffs contend that it is both arbitrary and absurd to require them to pay interest to the retailer on the amount of the security deposit for the entire period of the business relationship.

■ Admittedly, certain of these and other arguments advanced by plaintiffs are worthy of consideration. However, these challenges to § 2909 cannot be evaluated in isolation. Rather, § 2909 must be viewed in light of the other provisions of the Retail Sales of Motor Fuel Statutes, and particularly in light of the reasonable purpose attributable to § 2905 and § 2906 to insure the competitive viability of retail gasoline dealers for the overall public benefit. Admittedly, it does not appear quite as necessary to protect retailers against possible contract terms which, if abused, could be used as a means to force them out of business when the same legislation forbids the oil companies from taking over the operation of the stations in their place.

■ Nonetheless the test for an improper classification in violation of equal protection, again as set forth in *Globe Liquor Co., supra,* at 281 A.2d 23, is

"If any facts can be assumed which will support the classification, then that assumption must be made to uphold the classification."

The challenged statutes, taken together, seem to reflect a general legislative concern that the relationship between the producers and refiners and their retail dealers may be characterized by an inequality in bargaining power in favor of the producer and refiner, and that in view of developing modern conditions and the apparent increasing nationwide scarcity of petroleum resources, it is time for the State to recognize these factors and to undertake some protective regulation in a sector of its economy as to which previously no such need for interference existed. To the extent that such regulation produces a more stable and predictable system for the distribution of essential petroleum products under competitive market conditions, a benefit to the general public results.

■ Thus, even though the various provisions of § 2909 do restrict the plaintiffs in the exercise of their former business and property rights to a certain degree, it cannot be said as a pure matter of principle— or as a matter of law to put it in its proper perspective—that the requirements of

§ 2909 are either unnecessary or unreasonable on their face even though one side effect may appear to give benefits to retail gasoline dealers at the expense of their suppliers. In the abstract and in the absence of a more developed factual record, plaintiffs' motion premised on the foregoing provisions of § 2909 asks the Court to substitute its judgment for that of the General Assembly. On the present record I fail to see how it would be proper to do so.

### III.

Accordingly, the motion of the plaintiffs for partial summary judgment must be denied. If counsel can agree upon a form of order it would be appreciated. If not, a conference can be scheduled.