# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

In re Consolidated Delaware Real Estate  :
Commission Appeals.  :  Cons. C.A. No. K23A-09-001 JCC

Submitted:  September 9, 2024
Decided:  November 25, 2024

## <u>OPINION & ORDER</u>

*Upon Appeals from the Delaware Real Estate Commission – AFFIRMED.*

Charles Slanina, Esquire and David L. Finger, Esquire, Finger & Slanina, LLC., Wilmington, DE, *Attorneys for Appellants*.

A. Zachary Naylor, Deputy Attorney General Department of Justice, Dover, Delaware, *Attorney for Appellee*.

**Clark, R. J.**

Three licensees (the "Licensees") pursue a consolidated appeal of Delaware Real Estate Commission ("DREC" or the "Commission") decisions assessing civil penalties against them and publicly reprimanding them.[1] The Licensees allegedly failed to ensure that their subordinates, who were also licensed by DREC, completed the continuing education requirements necessary to renew their licenses.

The Licensees raise several issues in support of their appeal, some of which are novel. They fall into four principal categories, which include: (1) the constitutionality of the portion of DREC's enabling statute which gives DREC the power to assess a civil penalty against the Licensees; (2) whether a DREC regulation that holds supervisory brokers vicariously liable for a subordinate's failure to meet continuing education requirements exceeds DREC's statutory authority; (3) whether DREC unlawfully assessed a civil penalty in a default amount without considering the Licensees' individual circumstances; and (4) whether DREC had the authority to impose a public, as opposed to only a private, reprimand.

For the reasons that follow, DREC constitutionally penalized the Licensees, acted within the parameters of the State's statutes, and did not abuse its discretion. As a result, DREC's decision must be affirmed.

## I.    FACTS AND PROCEDURAL HISTORY

As background, the Court will address relevant portions of 24 *Del. C.* Ch. 29 (hereinafter DREC's "Enabling Statute"), the challenged regulations that DREC promulgated under the Enabling Statute, and DREC's processes applicable to the Licensees' appeal. The Court will then discuss the individual circumstances relevant

---

[1] Pursuant to Superior Court Civil Rule 42(a), "[w]hen actions involving a common question of law or fact are pending before the Court, it may . . . order all the actions consolidated[.]" As such, this consolidated appeal retains the civil action number of the first filed appeal. K23A-09-001 JJC. All docket item ("D.I.") citations *infra* refer to this civil action number unless otherwise noted.

to the proceedings below because the Licensees' appeal requires, in part, reviews of the records from the two cases below for substantial evidence.

## A. Relevant Statutory, Regulatory, and Procedural Background

The Delaware General Assembly prescribed DREC's purpose, powers, and duties in the Enabling Statute.[2] There, it defined DREC's primary objective as one "to protect the general public, specifically those persons who are the direct recipients of services regulated by this chapter, from unsafe practices and from occupational practices which tend to reduce competition or fix the price of services rendered."[3]

To meet those objectives, the General Assembly *requires* DREC to develop standards to assure professional competence, to adjudicate formal hearings, to promulgate rules and regulations, and to impose sanctions, when necessary, against licensees who provide real estate services.[4] More specifically, the General Assembly requires DREC to:

> (1) [f]ormulate rules and regulations, with appropriate notice to those affected; all rules and regulations shall be promulgated in accordance with the procedures specified in the Administrative Procedures Act, Chapter 101 of Title 29. Each rule or regulation shall implement or clarify a specific section of this chapter[;]
>
> .     .     .
>
> (3) [e]stablish the qualifications for licensure and evaluate the credentials of all applicants for a license to practice real estate services[;]
> (4) [g]rant licenses to, and renew licenses of, all individuals who meet the qualifications for licensure and renewal[;]
>
> .     .     .
>
> (6) [e]stablish by rule and regulation prelicensing and continuing education standards required for licensure and license renewal[;]

---

[2] *See generally* 24 *Del. C.* §§ 2900, 2906.

[3] *Id.* § 2900(a). Germane to this appeal, DREC's secondary objective is to "maintain minimum standards of licensee competency" and certain standards in the delivery of services to the public. *Id.* § 2900(c).

[4] *Id.* § 2900(c).

(7) [p]erform random audits of continuing education credits submitted by licensees for license renewal[;]

.    .    .

(10) [c]onduct hearings and issue orders in accordance with procedures established pursuant to Chapter 101 of Title 29[; and]
(11) [d]esignate and impose the appropriate sanction or penalty where it has been determined after a hearing that penalties or sanctions should be imposed.[5]

DREC regulates licensees and non-licensees by tiers as required by the Enabling Statute. The licensing tiers include the categories of real estate brokers, associate brokers, salespersons, and non-licensees who perform real estate services without authority to do so.[6]  A "broker" is responsible for maintaining the office and escrow account for the brokerage organization.[7]  Both "associate brokers"[8] and "salespersons"[9]  must be licensed under a broker and work within a broker's office and brokerage organization.[10]

Central to this appeal, the Enabling Statute defines a real estate broker as follows:

> any individual who holds a broker license from the Commission and who for a compensation or valuable consideration, is self-employed or is employed directly or indirectly by a brokerage organization to sell or

---

[5] *See generally id.* § 2906(a)(1)–(13).

[6] *Id.* § 2900(c).

[7] 24 *Del. C.* §§ 2902(a)(2), 2923(a).

[8] An associate broker is defined as,
> any individual who holds an associate broker license from the Commission and who is licensed under a broker to sell or offer to sell, or to buy or to offer to buy, or to negotiate the purchase, sale, or exchange of real estate, or to lease or rent or offer for rent any real estate, or to negotiate leases or rental agreements thereof or of the improvements thereon for others.  *Id.* § 2902(a)(1).

[9] A salesperson is defined as,
> any individual who holds a salesperson license from the Commission and who is licensed under a broker to sell or offer to sell, or to buy or to offer to buy, or to negotiate the purchase, sale, auction or exchange of real estate, or to lease or rent or offer for rent any real estate, or to negotiate leases or rental agreements thereof or of the improvements thereon for others.  *Id.* § 2902(a)(23).

[10] *Id.* § 2902(2)–(3).

4

offer to sell, or to buy or offer to buy, or to negotiate the purchase, sale, or exchange of real estate, or to lease or rent or offer for rent any real estate, or to negotiate leases or rental agreements thereof or of the improvements thereon for others. *The broker is responsible for providing real estate services and is primarily responsible for the day to day management and supervision of a brokerage organization as it relates to this chapter.*[11]

Also central to this appeal is DREC's Regulation 1.3.1 which provides:

[i]t is the responsibility of the employing Broker to ensure that the Broker's Licensees comply with the Commission's Rules and Regulations. *Every Broker is responsible for making certain that all of the Broker's Salespersons and Associate Brokers* are currently licensed, make timely application for license renewal, and *meet the Commission's continuing education requirements.* The Broker shall co-sign continuing education logs and shall maintain copies of continuing education certificates for the Broker's Salespersons and Associate Brokers for at least three years after the conclusion of each renewal period.[12]

DREC Regulation 12.0 requires licensees to renew their licenses every two years.[13] When applying for renewal, licensees must complete continuing education ("CE") modules in seven subject areas for a total of twenty-one hours within a two-year span.[14] The Commission prorates the requirements for those who were licensed less than two years during a renewal period.[15] Furthermore, if a licensee faces a hardship during the renewal period, he or she can seek a waiver or postponement.[16]

---

[11] *Id.* § 2902(a)(2) (emphasis added).

[12] 24 *Del. Admin. C.* § 2900–1.3.1 (emphasis added) [hereafter "DREC Regulation 1.3.1"]. To remain consistent with DREC's usage, the Court adopts the term "DREC Regulation __" to refer in the body of the Opinion to the corresponding section of the Delaware Administrative Code.

[13] 24 *Del. Admin. C.* § 2900–12.0; 24 *Del. C.* § 2910.

[14] 24 *Del. C.* § 2910(d); 24 *Del. Admin. C.* § 2900–14.0.

[15] 24 *Del. Admin. C.* § 2900–14.0.

[16] *Id.* § 14.8.

When a licensee applies for renewal, he or she must "attest to completion of the required CE" during the two-year renewal period.[17]  DREC regulations further provide that the attestation of the subordinate licensee does not relieve a supervisory broker of the responsibility to ensure that the subordinate completed the CE requirements.[18]

In the briefing, DREC represents that it has over 7,000 licensees.[19]  Any licensee who applies late for a renewal is subject to a CE audit.[20]  Apart from that, DREC randomly selects licensees to audit for CE compliance as authorized by the Enabling Statute.  Those audited must supplementally verify their attendance for the required number of CE hours.[21]

A licensee who is included in the audit who demonstrates compliance faces no administrative action.[22]  If the licensee fails to demonstrate CE compliance, however, a Division of Professional Regulation hearing officer holds an Administrative Procedures Act (the "APA") compliant hearing to determine if the failure was justified.[23]  The hearing officer considers mitigating factors and extenuating circumstances during that hearing.[24]  To that end, DREC considers only unjustified noncompliance to be violative of 24 *Del. C.* § 2912(a)(9).[25]  An offending licensee is then subject to disciplinary sanctions by DREC.[26]

---

[17] *Id.* § 14.4.

[18] *Id.* § 14.5.

[19] Answering Br. at 7 (D.I. 15).

[20] *Id.* (citing 24 *Del. Admin. C.* § 2900–14.6.8).

[21] *Id.*

[22] *Id.* (citing 24 *Del. Admin. C.* § 2900–14.6.6).

[23] *Id.*; *see also* 24 *Del. C.* § 2913(a)–(b); 24 *Del. Admin. C.* § 2900–14.6.6.

[24] 24 *Del. Admin. C.* § 2900–14.6.6.

[25] In full, it provides that, "[a] licensee shall be subject to disciplinary sanctions set forth in § 2914 of this title if after a hearing, the Commission finds that the licensee: . . . (9) Has violated a provision of this chapter, any of the rules and regulations established thereunder, or any order of the Commission[.]"  24 *Del. C.* § 2912(a)(9).

[26] 24 *Del. C.* § 2914; Pursuant to one of the challenged regulations adopted by DREC, a first offense results in a minimum fine of $250, in combination with any other sanctions available.  A

After the hearing, an aggrieved licensee can submit exceptions, comments, and arguments to the Commission to contest the hearing officer's conclusions of law and recommended penalties.[27] While DREC is bound by the hearing officer's findings of fact, it may affirm or modify the hearing officer's conclusions of law and recommended penalty.[28] The Commission deliberates, takes a vote, and then issues its final decision.

If the Commission finds that a licensee violated 24 *Del. C.* § 2912(a),[29] the Enabling Statute permits it to impose any of the following disciplinary sanctions, whether singularly or in combination:

(1) [i]ssue a letter of reprimand;
(2) [p]lace the licensee on probationary status and require the licensee to:
    a. [r]eport regularly to the Commission upon the matters which are the basis for the probation; and/or
    b. [l]imit real estate services activities to those areas prescribed by the Commission.
(3) [i]mpose a monetary penalty not to exceed $5,000 for each violation;
(4) [s]uspend any licensee's license[;or]
(5) [r]evoke or permanently revoke any licensee's license.[30]

An aggrieved licensee then has the right of appeal to the Superior Court.[31]

### B. The Facts of Record and Decisions Below

The Licensees raised common issues of law and fact in their appeals. The parties then stipulated to consolidation. Most issues involve the constitutionality of

---

second offense on unjustified noncompliance results in a $1,000 minimum fine. 24 *Del. Admin. C.* § 2900–14.6.7
[27] 29 *Del. C.* § 8735(v)(1)(d).
[28] *Id.*
[29] 24 *Del. C.* § 2912(a) (providing that "[a] licensee shall be subject to [the] disciplinary actions set forth in § 2914 . . . if after a hearing, the Commission finds that the licensee" has engaged in any of the enumerated grounds for discipline within this section).
[30] 24 *Del. C.* § 2914(a)(1)–(5).
[31] 24 *Del. C.* § 2913(b).

a portion of the Enabling Statute and the lawfulness of DREC regulations and processes under the Enabling Statute. Those matters require no fact specific inquiry. One of the Licensees' contentions, however—that DREC did not consider the individual facts and circumstances of their cases when deciding the appropriate penalty amounts—requires the Court to consider the individual facts of record in each case so it can perform substantial evidence reviews.

### 1. John D'Ambrosia[32]

John D'Ambrosia is a Delaware licensed real estate broker.[33] He is also the broker responsible for Ho Jun Mun, a Delaware licensed real estate salesperson.[34] DREC randomly selected Mr. Mun for an audit to examine his CE compliance from May 1, 2020, through April 30, 2022 (the "renewal period").[35] The audit revealed that Mr. Mun failed to complete CE requirements during the renewal period and, as a result, potentially violated DREC Regulations 1.3.1 and 1.3.2 (hereinafter collectively the "Regulations").[36]

A hearing regarding the allegations followed.[37] There, in a combined hearing with Mr. Mun, Mr. D'Ambrosia was required to show cause why he should not be disciplined by DREC for Mr. Mun's failure to satisfy his CE requirements.[38] Both acknowledged that they violated the Regulations at the hearing.[39] In mitigation, Mr.

---

[32] The facts contained herein are taken from the Certified Record of the underlying DREC proceeding involving Mr. D'Ambrosia, Civil Action Number K23A-09-001 JJC. [hereinafter referred to as "D'Ambrosia Certified Record, Tab __, at __."].

[33] D'Ambrosia Certified Record, Tab 1, at 1.

[34] *Id.*

[35] *Id.*

[36] *Id.* at 2. DREC Regulation 1.3.2 provides for potential disciplinary sanctions when a broker fails to ensure his or her subordinate meets CE requirements. Specifically, it provides that a "[b]roker's failure to satisfy the requirements set forth in subsection 1.3.1 may result in disciplinary action and possible disciplinary sanctions pursuant to 24 *Del. C.* §2914." *Id.*

[37] D.I. 15, Ex. 3.

[38] *Id.* at 3:24–4:8.

[39] *Id.* at 27:10–13.

8

D'Ambrosia testified that, "we thought it was 12 hours. And we expected to be told everything is fine. And then, we were told we picked the wrong date. And it should have been 6 more hours. So, it is a mistake. I can't change that."[40]

After the hearing, the hearing officer found the following by a preponderance of the evidence: Mr. Mun was an active salesperson licensee of DREC; DREC randomly selected him for an audit; Mr. Mun was deficient by three CE hours during the renewal period; but, Mr. Mun had completed the required hours after the renewal period by March 2023.[41] The hearing officer then recommended that the Commission fine Mr. D'Ambrosia five hundred dollars and report the discipline publicly on the Commission's online data base.[42]

On July 13, 2023, DREC considered the hearing officer's recommendations.[43] Mr. D'Ambrosia declined to file written exceptions to his recommendations. The Commission then provided a written decision accepting the hearing officer's recommendations in their entirety.[44]

### 2. *Kyree Stein & Catherine York*[45]

The second matter in this consolidated appeal involves DREC's actions taken after a hearing examining similar allegations against Kyree Stein and Catherine York. Ms. York is a Delaware licensed real estate broker; she is also the broker responsible for Kyree Stein, a Delaware licensed real estate associate broker.[46] In April 2023, DREC held a joint hearing to examine their CE compliance.

The hearing record demonstrates that DREC had randomly selected Ms. Stein

---

[40] *Id*. at 27:17–20.
[41] D'Ambrosia Certified Record, Tab 3, at 4.
[42] *Id*. at 15.
[43] D'Ambrosia Certified Record, Tab 2.
[44] D'Ambrosia Certified Record, Tab 1, at 3.
[45] The facts contained herein are taken from the Certified Record of the underlying DREC proceeding involving Ms. Stein and Ms. York, Civil Action Number K23A-09-002 NEP. [hereinafter referred to as "Stein & York Certified Record, Tab __, at __."].
[46] Stein & York Certified Record, Tab 1, at 1.

for an audit.[47]  The audit examined the renewal period, while noting that she had been licensed in Delaware for less than two years during that period.[48]  Again, Regulation 1.3.1 required Ms. York to ensure that Ms. Stein complied with CE requirements during the renewal period because Ms. York was Ms. Stein's responsible broker.[49]  The audit revealed that Ms. Stein did not complete the required CE hours.[50]

The matter then proceeded to a hearing.[51]  There, Ms. Stein testified that she had mistakenly believed she needed to complete twelve CE hours only.[52]  On that point, she testified as follows: "I'm currently licensed in 9 States [sic].  So, the [c]ontinuing [e]ducation courses can get a little mixed up.  But it was just an oversight on my part."[53]

For Ms. York's part, she also admitted to violating the Regulations.  She testified as follows:

> Just to kind of explain our understanding of what the CE requirements were … [w]e understood it to be 12 hours.  And that's how we read it on the website for Ms. Stein.
>
> .   .   .
>
> [U]pon reviewing that Audit Notice, it was brought to our attention that one course was not completed.  We understood that we did not read that correctly.
>
> .   .   .
>
> [w]e acknowledge that we did not meet the requirements and incorrectly read the requirements.[54]

The hearing officer followed with written findings.  As to Ms. Stein, he found

---

[47] Stein & York Certified Record, Tab 5, at 10:16–11:1.
[48] *Id*. at 10:11.
[49] 24 *Del. Admin. C.* § 2900–1.3.1.
[50] Stein & York Certified Record, Tab 1, at 1.
[51] Stein & York Certified Record, Tab 5.
[52] Stein & York Certified Record, Tab 1, at 1.
[53] Stein & York Certified Record, Tab 5, at 20:7–10.
[54] *Id.* at 21:5–22:11.

10

her to be a licensed real estate salesperson during the renewal period.[55] Furthermore, he found that Ms. Stein completed eighteen out of twenty-one CE requirements and failed to complete a training module during the renewal period.[56] The hearing officer also found Ms. York to be Ms. Stein's responsible broker during the renewal period.[57] He further found Ms. York accountable under the Regulations for failing to ensure that Ms. Stein fulfilled her CE requirements.[58]

The hearing officer then recommended that DREC sanction Ms. Stein and Ms. York as follows:

- a letter of reprimand to both: as to Ms. Stein, for falsely attesting at her license renewal that she had completed the CE requirements. As to Ms. York, because she was responsible for Ms. Stein's failure to comply;
- for Ms. Stein, that her now-completed CE hours and modules be retroactively credited to her account and that she be audited for the next license renewal period;
- for both, a $500 fine payable within 90 days; and
- for both, in the event of non-compliance with DREC's ensuing order, then suspension of license without further notice.[59]

Ms. Stein and Ms. York filed objections with DREC arguing that their spotless disciplinary records justified lower sanctions.[60] There, Ms. York urged the Commission to consider a reduced sanction because of the innocent nature of the mistake and that the penalty imposed was disproportionately harsh.[61] Both objected to the Hearing Officer's characterization of Ms. Stein's attestations as "false."[62] Finally, both contended that their states of mind mitigated their conduct, that the

---

[55] Stein & York Certified Record, Tab 1, at 1–2.
[56] *Id*. at 1.
[57] *Id*.
[58] *Id.* at 1–2.
[59] *Id.* at 2.
[60] *Id.*
[61] *Id*. at 2–3.
[62] *Id.* at 2.

transgression involved only a small number of CE hours, and that they quickly remediated the matter.[63]

DREC considered the hearing officer's conclusions of law and recommendations, and Ms. Stein and Ms. York's objections.[64] DREC accepted them and also recognized Ms. York's contrition and that she had instituted new procedures to prevent further occurrences.[65] As to the penalty assessment, DREC noted that "[a]ll of these factors have been considered in forming the recommended discipline."[66] Nevertheless, the Commission found that "its policy of maintaining consistency in its monetary penalties and issuance of letters of reprimand for violation of the [DREC]'s CE requirements outweighs any factors presented in this case that otherwise might favor reduction of the recommended sanctions and penalties."[67]

### C. The Licensees' Superior Court Appeal

The Superior Court has jurisdiction to hear appeals from DREC pursuant to 24 *Del. C.* § 2913(b).[68] Mr. D'Ambrosia appealed DREC's adverse decision.[69] On the same day, Ms. Stein and Ms. York filed their joint appeal.[70] At the request of the parties, the Court approved a stipulated order consolidating the two appeals as *In re: Consolidated Delaware Real Estate Commission Appeals* and set a briefing schedule.[71] Oral argument followed, and the parties provided written supplements

---

[63] *Id.*

[64] *Id.* at 3.

[65] *See generally id.* at 1–5.

[66] *Id.* at 10.

[67] *Id.* at 3.

[68] *See* 24 *Del. C.* § 2913(b) (providing that, "[w]here the licensee is in disagreement with the action of the Commission, the licensee may appeal the Commission's decision to the Superior Court[.]").

[69] Notice of Appeal (D.I. 1, Sep. 14, 2023).

[70] Notice of Appeal (D.I. 1, Sep. 14, 2023) in civil action number K23A-09-002 NEP (Stein & York).

[71] Consolidation Order (D.I. 8).

regarding issues raised during the argument.

Collectively, the Licensees contend that: (1) 24 *Del. C.* § 2914(a)(3) is unconstitutional because it violates the doctrine of separation of powers by improperly delegating to DREC the power to impose monetary penalties without providing guidance regarding how to exercise that discretion; (2) the Regulations exceed DREC's statutory authority when imposing strict liability on supervisory brokers; (3) the Commission's practice of imposing standard civil penalties of $500 for like offenses is an abuse of discretion; and (4) DREC exceeded its statutory authority when publicly reprimanding the Licensees.

DREC argues the opposite. It contends that the General Assembly constitutionally delegated the challenged authority to DREC, that DREC is acting in furtherance of express authorization supplied by the General Assembly, that it did not abuse its discretion when fining the Licensees $500 each, and that the Commission possessed statutory authority to issue a public reprimand.

## II. STANDARDS

The scope of review in an administrative appeal to the Superior Court is generally limited to whether the agency's ruling is supported by substantial evidence and free from legal error.[72] Substantial evidence is the degree of evidence which "a reasonable mind might accept as adequate to support a conclusion."[73] The Court does not reweigh the evidence, reassess credibility, or make its own factual findings or conclusions.[74] Rather, the Court must "search the entire record to determine whether, on the basis of all the testimony and exhibits before the agency, it could fairly and reasonably reach the conclusion that it did."[75]

---

[72] *Prunckun v. Del. Dep't of Health and Soc. Servs.*, 201 A.3d 525, 540 (Del. 2019) (quoting *Stoltz Mgmt. Co. v. Consumer Affairs Bd.*, 616 A.2d 1205, 1208 (Del. 1992)).
[73] *Id.* (citing *Lehto v. Bd. of Educ.*, 962 A.2d 222, 225–26 (Del. 2008)).
[74] *Christiana Care Health Servs. v. Davis*, 127 A.3d 391, 394 (Del. 1988).
[75] *Nat'l Cash Register v. Riner*, 424 A.2d 669, 674–75 (Del. Super. 1980).

The Licensees constitutional and statutory challenges raise questions of law, however. The Court considers questions of law—which require reviews for legal error—*de novo*.[76]

## III. ANALYSIS

As explained below, the Enabling Statute constitutionally delegates authority to DREC to impose a civil penalty. Furthermore, the Enabling Statute provided the Commission the power to lawfully promulgate the Regulations. The Commission also did not abuse its discretion in this case when it placed emphasis on the consistency of penalties imposed against these Licensees and others. Finally, DREC acted within its statutory authority when issuing a public, as opposed to a private, reprimand.

### A. The provision in the Enabling Statute that grants DREC the authority to impose a monetary penalty for CE violations does not violate the separation of powers doctrine.

The concept of separation of powers is as fundamental an underpinning of Delaware Constitutional law as in Federal Constitutional law, even though the Delaware Constitution has no express provision that provides for it.[77] Delaware courts have nevertheless long acknowledged the appropriateness of the General Assembly's delegation of regulatory authority to administrative agencies.[78] As our Supreme Court has recognized, "a strict adherence and complete separation of governmental departments is neither desirable nor intended [and] a certain degree of pragmatic flexibility in the application of the Doctrine is essential [to permit] newly

---

[76] *Prunckun*, 201 A.3d at 540 (citing *Del. Dep't of Nat. Res. & Env't. Control v. Sussex Cnty.*, 34 A.3d 1087, 1090 (Del. 2011)).

[77] *Opinion of the Justices*, 380 A.2d 109, 113 (Del. 1977); *Joseph v. C.C. Oliphant Roofing Co.*, 711 A.2d 805, 808 (Del. Super. 1997) (quoting *Evans v. State*, 872 A.2d 539, 547 (Del. 2005)).

[78] *State v. Durham*, 191 A.2d 646, 649 (Del. Super. 1963) (citing *Hoff v. State*, 197 A. 75 (Del. Super. 1938)).

perceived needs and practical exigencies."[79]

Accordingly, there is a tension between impermissible delegation and the need to defer to the expertise of administrative agencies in modern society. The Delaware Supreme Court accounted for that tension in the following standard it set for unlawful delegations claims under Delaware's Constitution:

> [a] statute or ordinance vesting discretion in administrative officials without fixing any adequate standards for their guidance is an unconstitutional delegation of legislative power. But a qualification to that rule is that where the discretion to be exercised relates to police regulation for the protection of public morals, health, safety, or general welfare, and it is impracticable to fix standards without destroying the flexibility necessary to enable the administrative officials to carry out the legislative will, the legislation delegating such discretion without such restrictions may be valid. Adequate safeguards and standards to guide discretion must be found in or be inferable from the statute, but the standards need not be minutely detailed, and the whole [statute] may be looked into in light of its surroundings and objectives for purposes of deciding whether there are standards and if they are sufficient.[80]

Paragraph 2914(a)(3) of Title 24 of the Delaware Code (hereafter "Paragraph 2914(a)(3)") authorizes the Commission to impose a monetary penalty not to exceed $5,000 for violations of any DREC rule or regulation authorized by the Enabling Statute.[81] The Licensees contend that this portion of the Enabling Statute is facially "unconstitutional on the ground that the [General Assembly] violated the Separation of Powers doctrine by failing to provide any criteria for DREC to use in imposing penalties."[82] They further argue that Paragraph 2914(a)(3) provides DREC with

---

[79] *Opinion of the Justices*, 380 A.2d at 114.

[80] *Atlantis I Condo. Ass'n v. Bryson*, 403 A.2d 711, 712–13 (Del. 1979) (quoting *Durham*, 191 A.2d at 649–50); *accord State v. Braun*, 378 A.2d 640 (Del. Super. 1977).

[81] 24 *Del. C.* § 2914(a)(3); *see also* 24 Del. C. § 2912(a)(9) (providing that a licensee is subject to disciplinary sanctions set forth in § 2914 if he or she violates "a provision of [the Enabling Statute], any of the rules and regulations established thereunder, or any order of the Commission.").

[82] Opening Br. at 6 (D.I. 13). Tellingly, the Licensees cite no Delaware case law to support their

"unfettered and unguided discretion to affix monetary penalties" for anything below $5,000.[83] In other words, they assert that it is unconstitutional because the Enabling Statute does not contain granular factors restricting DREC's discretion. The Licensees contend that there should have been parameters to require the Commission to consider circumstances such as: (i) the willfulness of the violation; (ii) the gravity of the violation; (iii) past violations; (iv) the amount of violations; (v) whether the violator obtained an economic benefit; and (vi) other factors that justice may require.[84]

Conversely, DREC contends that it "followed the legislative policy directions of the General Assembly to create rules for continuing education enforcement by creating a framework in its regulations to make the possible consequences of noncompliance clear for those affected by the rules."[85] DREC emphasizes APA strictures imposed upon it when promulgating regulations. The Commission also

---

arguments. The Licensees do, however, cite several out-of-state cases that, on balance, do not tip the scale in their favor given Delaware Supreme Court benchmarks regarding delegation. *See e.g. Cnty. Council for Montgomery Cnty. v. Invs. Funding Corp.*, 312 A.2d 225, 246 (Md. 1973) (holding that a state commission's discretion to fix civil penalties in any amount up to $1,000 was unconstitutional because of a complete lack of any legislative safeguards or standards, but nevertheless recognizing that "the authority to impose a civil monetary penalty is not a power beyond constitutional delegation to an administrative agency"); *Miller v. Pollution Control Bd.*, 642 N.E.2d 475, 482 (Ill. App. Ct. 1994) (rejecting an appellant's argument that an administrative citation procedure violated the separation of powers principle because the state board in question only imposed an established fine and had no discretion in determining the amount of the penalty to be assessed); *U.S. Steel Corp. v. State*, 397 P.2d 440, 442 (Wash. 1964) (holding that a statute granting a tax commission exclusive and unrestricted discretion to determine the amount of interest, not to exceed six per cent per annum, as a penalty for delinquent taxes was "an unconstitutional delegation of legislative authority in the absence of a declared legislative purpose and of accompanying [standards] . . . whereby exercise of discretion might be measured"); *Matter of Civ. Penalty*, 379 S.E.2d 30, 34–37 (N.C. 1989) (holding, *inter alia*, the North Carolina legislature was not prohibited "from conferring on administrative agencies the power to exercise discretion in determining civil penalties within an authorized range, provided that adequate guiding standards accompany that discretion").

[83] *Id.* at 10.
[84] *Id.* at 11.
[85] D.I. 15, at 13.

16

stresses APA procedural requirements imposed on the case decision process which provide further safeguards. Finally, the Commission points to its regulations that recognize the potential for justified violations and set parameters regarding penalties as additional safeguards.

There are two general principles that guide the Court's analysis when deciding whether Paragraph 2914(a)(3) unconstitutionally delegates authority to the Commission. First, at the highest level, when evaluating the constitutionality of any statutory provision, any reasonable doubt regarding the constitutionality of an act should be resolved in favor of finding the legislation constitutional.[86] In other words, if there is a possible constitutional construction of the law, then the law facially passes constitutional muster.[87] Second, when narrowing the focus to the more specific—the question of the General Assembly's ability to delegate functions to administrative agencies—the General Assembly is free to "establish basic policy and vest in others the power to administer the declared legislative policy."[88] As the Delaware Supreme Court explained,

> [t]he authority granted to an administrative agency should be construed so as to permit the fullest accomplishment of the legislative intent or policy. An expressed legislative grant of power or authority to an administrative agency includes the grant of power to do all that is reasonably necessary to execute that power or authority.[89]

With those principles in mind, the focus narrows further to examining DREC's Enabling Statute. At the outset, the Enabling Statute defines DREC's primary objective as being one "to protect the general public, specifically those persons who are the direct recipients of services regulated by this chapter, from

---

[86] *Atlantis I*, 403 A.2d at 714.
[87] *Id.*
[88] *Schweizer v. Bd. of Adjustment of City of Newark*, 980 A.2d 379, 384 (Del. 2009).
[89] *Atlantis I*, 403 A.2d at 713 (citing *Kreshtool v. Delmarva Power and Light Co.*, 310 A.2d 649 (Del. 1973)).

17

unsafe practices and from occupational practices."[90]   Furthermore, the Statute *requires* DREC to "develop standards assuring professional competence; . . . adjudicate at formal hearings; . . . promulgate rules and regulations; [and] impose sanctions where necessary against licensees and non licensees engaged in the practice of providing real estate services."[91]   The General Assembly expressly tasks DREC in the Enabling Statute with establishing the qualifications for licensure,[92] and adopting rules and regulations that control licensure and license renewal.[93] Using these benchmarks to garner legislative intent, the Court must construe Paragraph 2914(a)(3) in a manner that provides the Commission the authority to do what is reasonably necessary to accomplish the General Assembly's intent—i.e., protecting the public by requiring competent real estate services for the citizens of Delaware, which includes setting standards for professional competency.

The Delaware Supreme Court decision in *State v. Durham*[94] is instructive. There, the defendant used the title of registered engineer without being licensed or registered pursuant to 24 *Del. C.* Ch. 28.[95]   The defendant contended, *inter alia*, that the General Assembly violated separation of powers principles by delegating legislative power to the Council of the Delaware Association of Professional Engineers, an administrative body.[96]   The Supreme Court disagreed.  It found the delegation appropriate because it was necessary to protect the health, safety, and

---

[90] 24 *Del. C.* § 2900(a).  The DREC's secondary objective is to "maintain minimum standards of licensee competency" and certain standards in delivery of services to the public.  *Id.* § 2900(c).
[91] *Id.* § 2900(c).
[92] 24 *Del. C.* §2906(a)(3).
[93] *Id.* § 2906 (a)(6).
[94] 191 A.2d 646 (Del. 1963).
[95] *Id.* at 648.  At the time of the *Durham* decision, professional engineers were regulated under Chapter 27 of Title 24.
[96] *Id.* at 649.  The appellant in *Durham* also challenged the statute at issue on the grounds of vagueness.  *Id.*  The Court denied the appeal on that basis as well for similar reasons as those used to address the appellant's unconstitutional delegation argument.  *Id.*

welfare of the State's citizens. The Court further explained that the delegation was appropriate because it required the Council to determine whether individuals were fit to practice in that licensed profession.[97]  Tellingly, the Supreme Court found licensing authority to fall "within *the police power* of the State to establish reasonable standards to be complied with as a prerequisite to engaging in such pursuits."[98]  The Supreme Court's recognition that licensing regulation should be considered an aspect of the State's police power becomes important in the Court's analysis that follows.

The principal authority in Delaware that sets the standards for evaluating whether the General Assembly unconstitutionally delegated too much discretion to an agency is *Atlantis I Condominium Association v. Bryson*.[99]  There, the Supreme Court examined whether the Beach Preservation Act of 1972 (the "Act") permissibly delegated authority to the Department of Natural Resources and Environmental Control ("DNREC") to deny a permit to build on three beachfront lots.[100]  That Act provided DNREC only general authority: namely, the authority to adopt regulations governing residential construction on private beach property.[101]  The Act did not address permitting.

The *Atlantis I* decision, which followed *Durham*, is important because, in it, the Supreme Court articulated the standard necessary to delineate between where regulated conduct and consequences must be defined by statute and when an agency can lawfully address matters through regulation.[102]  In *Atlantis I*, the Court highlighted the deferential nature of the test as follows:

> [a]dequate safeguards and standards to guide discretion must be found

---

[97] *Id.* at 650.
[98] *Id*. at 648 (emphasis added).
[99] 403 A.2d 711 (Del. 1979).
[100] *Id.*; *see generally* 7 *Del. C.* Ch. 68.
[101] 7 *Del. C.* §§ 6801, 6803.
[102] *Atlantis I*, 403 A.2d at 712.

in or be inferable from the statute, *but the standards need not be minutely detailed, and the whole ordinance may be looked into in light of its surroundings and objectives for deciding whether there are standards and if they are sufficient*.[103]

The Supreme Court then examined the provisions in the Act that explained the General Assembly's intent and applied an expansive view of DNREC's powers. When doing so, the Court recognized DNREC's authority to issue permits (and deny them) even though the Act did not address permitting.[104] The Court found the delegation lawful because the Act provided DNREC such broad authority over the subject matter.[105] In that way, the Court relied upon statements of legislative intent that deferred to DNREC's expertise as a substitute for specific guidelines.[106]

Similarly, the Enabling Statute provides DREC broad authority to regulate realtor licensing issues. Significant deference is due the General Assembly's findings that DREC's expertise in licensing is an essential tool necessary to meet legislative goals.

The Licensees focus too narrowly on what granular safeguards they contend are necessary to curtail unfettered discretion. Namely, the *Atlantis I* decision looked to the totality of protections offered property owners when deciding whether the safeguards were adequate.[107] Delegation questions do not turn solely on whether there are minute statutory restrictions that constrain agency discretion within the Enabling Statute itself. Furthermore, as in *Durham* which addresses engineer licensing, DREC's licensing authority over the real estate profession falls within the police power of the State. Expanded deference is due the General Assembly's delegation to this case because it represents an exercise of the police power. To that

---

[103] *Id.* at 713 (quoting *Durham*, 191 A.2d at 649–50) (emphasis added).
[104] *Id.* at 717.
[105] *Id*. at 715.
[106] *Id*.
[107] *Id*. at 713.

end, the deference due the Enabling Statute, from a police power's perspective, recognizes that "the presence of procedural safeguards may ***compensate substantially*** for the lack of precise statutory standards."[108]

The provisions of Delaware's Administrative Procedures Act rank high among relevant procedural safeguards. In fact, the Enabling Statute expressly incorporates those procedures. Namely, Paragraph 2906(a)(1) of the Enabling Statute provides that "all rules and regulations shall be promulgated in accordance with the procedures specified in the [APA]."[109] Here, the Commission complied with the APA when it adopted the Regulations after publishing notice and providing the opportunity for public comment.[110] In this case, after two public hearings, no interested party objected to or criticized the strengthening of DREC Regulation 1.3 or the adoption of Regulation 14.6.7.[111]

Turning from the protections afforded licensees during the rule making process, Subsection 2900(c) of the Enabling Statute provides DREC the authority to "adjudicate at formal hearings."[112] The APA defines what process is due during case decision proceedings by including mechanisms to ensure an aggrieved licensee's right to notice and opportunity to be heard.[113] DREC regulations further provide for a hearing "to determine if there are any extenuating circumstances justifying noncompliance with the [CE] requirements."[114] Accordingly, the hearing

---

[108] *Id.* (citing *State v. Boynton*, 379 A.2d 994 (Me. 1977)) (emphasis added).

[109] 24 *Del. C.* § 2906(a)(1).

[110] D.I. 15, at 16; *see generally* 29 *Del. C.* §§ 10111–118.

[111] D.I. 15, at 17.

[112] 24 *Del. C.* § 2900(c).

[113] See 24 *Del. C.* § 2906(a)(1) (providing that hearings be conducted as required by the APA); *see also 29 Del. C.* §10161(a)(4) (including the Real Estate Commission in the list of agencies falling, *inter alia*, under the case decision provisions of the APA); 29 *Del. C.* Ch. 101, Subchapter III (providing the full range of rights afforded to an aggrieved party during the agency case decision process under the APA).

[114] 24 *Del. Admin. C.* § 2900–14.6.6 ("The hearing will be conducted to determine if there are any extenuating circumstances justifying noncompliance with the [CE] requirements. Unjustified

officer and the Commission must hold an APA-compliant hearing to consider the individual circumstances of each individual case.

DREC regulations then provide further notice and protections that include the requirement that the Commission consider extenuating circumstances before issuing a penalty. Such extenuating circumstances include "evidence to the satisfaction of the [DREC] of an illness, injury, financial hardship, family hardship, or other similar extenuating circumstances."[115] Moreover, DREC permits both the waiver or postponement of CE requirements—the licensee need only submit a written request to trigger that review.[116] Furthermore, the audit that starts the process is random; it is not targeted or calculated.[117] Aggrieved parties also have the right to challenge the hearing officer's recommendations before the Commission.[118] DREC then may issue the final decision only upon an affirmative vote.[119] Finally, if licensees remain unsatisfied with DREC's decision, they have a further appeal to this Court.

For the reasons above, DREC's processes do not violate separation of powers principles because (1) the General Assembly defined DREC's licensing role so broadly; (2) the APA separately provides sufficient procedural safeguards; and (3) DREC's promulgated regulations bolster those protections. On balance, Paragraph 2914(a)(3) does not leave unguided, uncontrolled, and unbridled discretion with DREC. The provision is constitutional on its face. Furthermore, the $500 civil penalties assessed against the Licensees, at the lower end of the statutory civil penalty range of "up to $5,000," do not violate separation of powers principles as

---

noncompliance with the [CE] requirements . . . shall constitute a violation of 24 *Del. C.* § 2912(a)(9).").

[115] *Id.* § 14.8.

[116] *Id.*

[117] Of note, however, if there has been a proven, unjustified noncompliance in one renewal period, then the licensee is subject to an audit for the next renewal period. In that case, it would be targeted.

[118] *See* 24 *Del. C.* § 2913(a) (providing that the APA applies).

[119] 24 *Del. C.* § 2904(c) (providing that, "no licensee shall be disciplined without the affirmative vote of at least 5 members.").

applied.

**B. The Regulations, which impose vicarious liability on brokers for the CE violations of their subordinates, do not exceed the Commission's statutory authority.**

The Licensees contend that Regulation 1.3.1[120] "neither protects the public from improper occupational practices nor maintains standards of licensee competency or otherwise maintain standards for brokers."[121] They submit that pursuant to DREC Regulations 12.3.2[122] and 14.3.3,[123] "those goals are satisfied by requiring licensees to satisfy CE requirements and attesting to same."[124] Simply put, the Licensees suggest that vicariously subjecting brokers to liability for the failures of their subordinates does not advance those goals.[125]

---

[120] Once again, Regulation 1.3.1 imposes strict liability on supervising brokers for the failures of their subordinates to meet CE requirements as follows:

> [i]t is the responsibility of the employing Broker to ensure that the Broker's Licensees comply with the Commission's Rules and Regulations. Every Broker is responsible for making certain that all of the Broker's Salespersons and Associate Brokers are currently licensed, make timely application for license renewal, and meet the Commission's continuing education requirements. The Broker shall co-sign continuing education logs and shall maintain copies of continuing education certificates for the Broker's Salespersons and Associate Brokers for at least three years after the conclusion of each renewal period.

[121] D.I. 13, at 13.

[122] Regulation 12.3.2 provides:

> A licensee shall satisfy the continuing education requirements, set forth in Section 14.0, within the two year renewal period, which ends on April 30 of even numbered years.

[123] Regulation 14.3.3 provides:

> For more than twenty-four months after course completion, twenty-one (21) hours of CE are required for each biennial renewal period, in compliance with the requirements of subsection 14.1.2.

[124] D.I. 13, at 13. Here, the Licensees concede, however, that the General Assembly has provided DREC the primary objective of protecting "the general public, specifically those persons who are the direct recipients of services regulated by this chapter, from unsafe practices and from occupational practices which tend to reduce competition or fix the price of services rendered." *Id.* (citing 24 *Del. C.* § 2900(a)).

[125] *Id.* Further, Licensees argue that, because no other State administrative licensing agency has a similar requirement, DREC Regulation 1.3.1 is beyond the statutory authority provided to DREC by the General Assembly. Licensees cite no Delaware caselaw on this issue, however.

23

It is true that an "administrative agency has no right to incorporate substantive matters or drastic remedies into its regulations which are not implied, necessary or incidental to the powers granted to it by the statute under which it operates."[126] Moreover, a regulation must be consistent with the provisions of the act that created it.[127] An administrative agency's sanction is lawful if the agency (1) does not exceed its statutory authority, and (2) substantial evidence supports its decision.[128]

Here, the Regulations are consistent with the Enabling Statute. Namely, a broker is "responsible for the day to day management and supervision of a brokerage organization[.]"[129] An associate broker and salesperson are both "licensed under a broker."[130] The Regulations make the broker jointly responsible with the subordinate to ensure, through supervision, that the subordinate complies with CE requirements. DREC's regulations are also internally consistent. Namely, DREC Regulation 14.5 provides that "[t]he Licensee's attestation as to completion of CE does not relieve the Broker of the Broker's duty to ensure that the Licensee has completed the required CE during the licensure renewal period."[131]

In essence, the General Assembly tasks DREC with overseeing a tiered licensing system and monitoring CE compliance within that system. The Regulations, which hold a supervisory broker responsible for a subordinate's failure to meet CE requirements, do not exceed DREC's statutory authority.

---

[126] *Carroll v. Tarburton*, 209 A.2d 86, 90 (Del. Super. 1965).
[127] *Am. Ins. Ass'n v. Del. Dept. of Ins.*, 2006 WL 3457623, at *3 (Del. Super. Nov. 29, 2006) (citing *Matter of Dep't of Nat. Res. & Env't Control*, 401 A.2d 93, 96 (Del. Super. 1978)).
[128] *Cary v. Del. Sec'y of State*, 2022 WL 951262, at *4 (Del. Super. Mar. 28, 2022).
[129] 24 *Del. C.* § 2902(a)(2).
[130] *Id.* § 2902(a)(1) (providing that an "associate broker" is "licensed under a broker"); *id.* § 2902(a)(23) (providing that a "salesperson" is "licensed under a broker").
[131] 24 *Del. Admin. C.* § 2900–14.5. Furthermore, even if a violation causes no harm, an administrative agency, pursuant to lawfully promulgated regulations, may impose disciplinary sanctions. *Cooper v. Del. Bd. of Nursing*, 264 A.3d 214 (Del. 2021) (TABLE).

Finally, the Licensees argue that scienter is required before the Commission can lawfully impose a penalty. They cite no authority, however, to support the premise that DREC cannot set CE requirements that do not turn on a licensees' state of mind. Scienter is a criminal concept; here, the Licensees faced no criminal exposure such as a fine, imprisonment, or indicia of arrest. Rather, the sanction is a *civil penalty* which falls within the powers of an agency provided the delegation of that authority is lawful.[132] Again, here it is.

**C. DREC did not abuse its discretion when issuing what the Licensees contend to be a $500 default penalty.**

Here, the General Assembly requires DREC to "develop standards assuring professional competence" and to "promulgate rules and regulations."[133] DREC promulgated Regulations 14.6.6 and 14.6.7 pursuant to that authority. Under the Regulations, if a licensee is found to be in *unjustified* noncompliance, the following potential civil penalty range applies:

> [t]he minimum penalty for the first finding of unjustified noncompliance shall be a $250.00 monetary penalty and any of the additional penalties specified in 24 *Del. C.* Section 2914. The minimum penalty for the second finding of unjustified noncompliance shall be a $1,000 monetary penalty and any of the additional penalties specified in 24 *Del. C.* Section 2914.[134]

Accordingly, Regulation 14.6.7 provides adequate notice to Licensees regarding the potential disciplinary sanctions for CE noncompliance. In addition, DREC Regulation 14.6.6 provides a licensee the opportunity for a hearing to address his or her individual circumstances.[135] Accordingly, Regulations 14.6.6 and 14.6.7

---

[132] *See Schultz v. Delaware Bd. of Architects*, 2018 WL 948624, at *3 (Del. Super. Feb. 16, 2018) (recognizing that at a licensee may be appropriately disciplined by a professional regulatory agency without regard to the licensee's state of mind).

[133] 24 *Del. C.* § 2906(c).

[134] 24 *Del. Admin. C.* § 2900–14.6.7.

[135] *Id*. § 14.6.6.

25

recognize the right to a hearing, the consideration of a licensee's individual circumstances, and provide sufficient notice of potential penalties.

The Licensees argue that the Commission acted arbitrarily by (1) setting a minimum penalty for violations, and (2) imposing a uniform penalty regardless of the circumstances.[136] They advance the first of these arguments in an attempt to demonstrate that DREC's regulations exceed its statutory authority. To that end, they contend that because the General Assembly did not include a minimum penalty in the Enabling Statute, the General Assembly intended that there not be one.[137] The Licensees identify no authority in support of this point, however.

A regulation such as this is the product of agency decision making that the courts have traditionally deferred to. Namely, it "is well settled that a Legislature, in enacting a law, complete in itself, for the regulation of particular matters, may expressly authorize an administrative body, within definite limits, to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose."[138] When the Commission set a presumptively minimum penalty it did not violate the Enabling Statute. Nor did it act arbitrarily when promulgating Regulation 14.6.7.

Turning from the Licensees' argument regarding the minimum penalty, the Court next focuses on the Licensees' claim that the Commission abused its discretion when it penalized the Licensees uniformly. As explained earlier, there is such an abuse of discretion only if there is not substantial evidence on the record to support the penalty imposed on each of the Licensees.

On this point, the Licensees contend that DREC failed to exercise any

---

[136] D.I. 13, at 10 (citing 24 *Del. Admin. C.* § 2900–14.6.7).
[137] *Id.*
[138] *Hoff v. State*, 197 A. 75, 79 (Del. Super. 1938).

discretion when imposing a "standard" flat penalty of $500.[139]  DREC counters that argument by emphasizing Delaware Supreme Court authority that stresses the importance of agency consistency in penalties.[140]  DREC further highlights cases where it deviated from the alleged default amount when the circumstances require it.[141]

In *Delaware Board of Medicine License & Disclosure v. Grossinger*,[142] the Supreme Court addressed the need for consistency in penalties when recognizing that for "notice to be adequate, [the administrative agency] must give reasonable persons clarity as to what conduct is proscribed.  To that end, consistency is key."[143] Conversely, it is axiomatic that agency case decisions must consider the individual circumstances of each case.  Thus, there is a need in administrative law to balance (1) the requirement for consistency in penalties, with (2) the need that an agency consider the individual circumstances of each case.  Here, the General Assembly entrusted that balancing to DREC.  An agency does not abuse its discretion if it chooses to place controlling weight on consistency as long it considers the individual circumstances of each case and bases its decisions on substantial evidence.

In Ms. Stein and Ms. York's Order, DREC adequately explained the basis for its decision.  Both admitted that they made mistakes which the Commission accepted as a demonstration of contrition.[144]  The Commission recognized, however, that "its policy of maintaining consistency in its monetary penalties and issuance of letters of reprimand for violation of the [DREC]'s CE requirements outweigh any factors presented in this case that otherwise might favor reduction of the recommended

---

[139] *See generally* D.I. 13, at 14–18.
[140] D.I. 15, at 18.
[141] *Id*. at 19–20.
[142] 224 A.3d 939 (Del. 2020).
[143] *Id.* at 957.
[144] Stein & York Certified Record, Tab 1, at 1–2.

sanctions and penalties."[145]   In fact, at Ms. Stein and Ms. York's hearing, the Commissioners specifically addressed their individual circumstances as follows:

> Commissioner Lane:   I want to make very clear that we, as the commissioners, we review every case on its own fact-finding information.  So, although our recommendation may be consistent in terms of the dollar amount.  I don't want it construed that we – or misconstrued that we are not considering these cases as individuals.  I think we focus on the dollar amount to be fair across the board.  Other factors in the order, other items in the order, I mean, we change all the time.[146]
>
> .   .   .
>
> Commissioner Marvel:  We put a lot of faith in our Hearing Officer's decision and their review of the fact and hearing the case.[147]
>
> .   .   .
>
> Commissioner Roger:  I agree with [Commissioners Lane and] Marvel.[148]
>
> .   .   .
>
> Commissioner Director:   I agree with [Commissioner Lane's] assessment of this.  And I – I think we do take this individually and very seriously.  But I think we strive for consistency and don't want to seem arbitrary and vary the findings.   I think, unless there's a compelling reason for deviating that we have a – a minimal standard of what we're going through in terms of how – how we would deviate from the hearing officer recommendation of what we feel is fair.[149]
>
> .   .   .
>
> Commissioner Olmstead:  Hopefully that gives you some clarification from some of the commissioners.[150]

The Licensees spent significant and laudable effort citing DREC decisions where a "standard" $500 fee was imposed in CE proceedings.[151]  When doing so,

---

[145] Stein & York Certified Record, Tab 1, at 2–3.
[146] Stein & York Certified Record, Tab 2, at 8:11–21.
[147] *Id.* at 8:22–24.
[148] *Id.* at 9:1–2.
[149] *Id.* at 9:4–12.
[150] *Id.* at 9:13–14.
[151] D.I. 13, at 14–17.  Licensees listed forty-eight instances of fines of this sort in their Opening Brief.

however, they conceded that DREC has at times altered its monetary penalties by increasing or decreasing the amount.[152] Further, the Licensees did not address that Mr. D'Ambrosia, himself, appealed only one of two DREC orders entered against him on the same day.[153] The court penalized him $250 in the matter he did not appeal, not $500.[154] It did so because the subordinate salesperson in that matter convinced DREC that an illness was an extenuating circumstance.[155] Thus, while the record demonstrates DREC's efforts to maintain consistency, DREC's imposition of some adjusted penalty amounts—including a different penalty imposed against one of the Licensees himself—supports that it evaluated the individual merits of the Licensees' cases.

In turning to Mr. D'Ambrosia's case, neither the hearing officer nor the Commission found mitigating factors or extenuating circumstances. DREC considered, among other things, that he accepted responsibility by admitting that he made a mistake.[156] That admission alone provided substantial evidence for the result.

In summary, on this record, the Commission did not abuse its discretion when balancing the need for consistency in penalties against the need to consider the individual circumstances of each case. The records in all three cases contain the substantial evidence necessary to support DREC's findings. As a result, those findings were not arbitrary or capricious.

### D. The Commission's issuance of a public letter of reprimand was not an abuse of discretion.

The Licensees also contend that the Commission impermissibly issued a

---

[152] *See id.*; *see also* Reply Br. at 7 (D.I. 16) ("In its response, DREC points to a few cases where a different penalty was imposed. Those, however, are the exceptions that prove the rule.").

[153] *See* D.I. 15, Ex. 2.

[154] *Id*. at 2.

[155] *Id.*

[156] D'Ambrosia Certified Record, Tab 1, at 2.

29

public letter of reprimand.[157]  Paragraph 2914(a)(1) of the Enabling Statute provides that the Commission may sanction a licensee, either alone or in combination with other sanctions, by issuing "a letter of reprimand."[158]  The Licensees seize on the fact that the statutory provision does not specify whether the reprimand should be public or private, which they believe permits only private reprimands.[159]  They further rely on Subsection 2906(11) of the Enabling Statute which authorizes DREC to "[d]esignate and impose the appropriate sanction or penalty where it has been determined after a hearing that penalties or sanctions should be imposed."[160]  The latter, they contend, prevents the Commission from expanding a penalty from a "reprimand" to a "public reprimand."[161]

The Licensees do not address the Delaware Freedom of Information Act ("FOIA"), however.[162]  As DREC correctly emphasizes, DREC is a "public body," as defined by FOIA.[163]  Public bodies are required to maintain open records and conduct business in the open, with limited exceptions that are not applicable here.[164]  DREC is also an "agency" as contemplated by  the APA.[165]  The APA makes agencies, such as DREC, subject to FOIA, which correspondingly makes their records available to the public upon request.[166]

---

[157] D.I. 13, at 19–21.

[158] 24 *Del. C.* § 2914(a)(1).

[159] D.I. 13, at 20.

[160] *Id.* at 19 (citing 24 *Del. C.* § 2906(11)).

[161] *Id*. at 19–20.

[162] 29 *Del. C.* § 10001 ("It is vital in a democratic society that public business be performed in an open and public manner so that our citizens shall have the opportunity to observe the performance of public officials and to monitor the decisions that are made by such officials in formulating and executing public policy; and further, it is vital that citizens have easy access to public records in order that the society remain free and democratic.  Toward these ends, and to further the accountability of government to the citizens of this State, this chapter is adopted, and shall be construed.").

[163] *Id.* § 10002(k).

[164] *Id.* §§ 10003–10004, 10127; 24 *Del. C.* § 2905.

[165] 29 *Del. C.* § 10102(1).

[166] *Id.* § 10112.

Thus, a DREC final order becomes a presumptively public record. The penalties assessed pursuant to those orders also become matters of public record absent specific legislative direction to the contrary. Had the General Assembly intended to override FOIA by permitting only *private* reprimands, it could have easily done so. For purposes of this appeal, DREC did not act outside of its statutory authority or abuse its discretion when issuing public reprimands given the open records requirements of FOIA.

## IV.   CONCLUSION

For the reasons explained above, the orders of the Delaware Real Estate Commission in this consolidated matter are **AFFIRMED**.


**IT IS SO ORDERED.**


/s/Jeffrey J Clark
Resident Judge